STATE OF NORTH CAROLINA v. RICHARD LANE HICKS, JR.

No. 75A92

(Filed 8 April 1993)

1. **Evidence and Witnesses § 1240 (NCI4th)— murder— confession — custodial**

    A confession made before *Miranda* warnings were given should have been suppressed in a murder prosecution where officers asked defendant to take a polygraph test to "clear his name" and transported defendant over an hour's drive away from his home in Mocksville to an S.B.I. office in Hickory for the purpose of administering a polygraph test; defendant never was taken home or offered transportation home even though he refused to take the polygraph on three separate occasions during two hours of questioning; and, although the polygraph operator informed defendant during an explanation of the polygraph procedure that he was not under arrest, defendant never was told that he was free to leave. While the findings of fact made by the trial court following the *voir dire* hearing are conclusive and binding if they are supported by competent evidence, the trial court's conclusion that defendant was not in custody when he made his incriminating statement to officers is a conclusion of law and is fully reviewable on appeal. Under the totality of the circumstances, a reasonable person in defendant's position, knowing that he was a suspect in a murder case and having just stated to a law enforcement officer that he wanted to take responsibility for that murder, would feel that he was compelled to stay, not that he was free to leave.

    **Am Jur 2d, Criminal Law §§ 793, 794; Evidence §§ 545, 551, 555, 557.**

    **What constitutes "custodial interrogation" within rule of Miranda v. Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

2. **Evidence and Witnesses § 732 (NCI4th)— murder—confession —harmless error analysis**

    The burden was on the State to establish that the admission of a murder defendant's initial confession, which he made

**STATE v. HICKS**

[333 N.C. 467 (1993)]

without benefit of *Miranda* warnings, was harmless beyond a reasonable doubt. Although defendants have the burden of establishing prejudice for errors relating to rights arising other than under the Constitution of the United States by showing a reasonable possibility of a different result had the error not been committed, and although the Supreme Court of the United States has stated that the *Miranda* exclusionary rule provides a remedy even to the defendant who has suffered no identifiable constitutional harm, states are required by *Miranda* to exclude unwarned statements resulting from custodial interrogation only because such an exclusion is required by the Constitution of the United States.

**Am Jur 2d, Appeal and Error §§ 798, 799, 800, 803.**

**Supreme Court cases determining whether admission of evidence at criminal trial in violation of federal constitutional rule is prejudicial error or harmless error. 31 L. Ed. 2d 921.**

3. **Evidence and Witnesses § 732 (NCI4th) — murder — confession — admission harmless error**

   The admission of a murder defendant's first confession in violation of the *Miranda* exclusionary rule was harmless beyond a reasonable doubt where defendant admitted his guilt in his second confession, which was properly admitted, gave a more detailed description of the crime, showed officers where he had hidden the gun used to kill the victim, and drew a map showing officers where he had hidden the gun case and ammunition. Furthermore, evidence of a detailed statement by defendant's brother was properly introduced and was consistent with defendant's second confession.

   **Am Jur 2d, Appeal and Error §§ 798, 799, 800.**

4. **Evidence and Witnesses § 1227 (NCI4th) — murder — multiple confessions — Miranda violation in first — second admissible**

   The trial court properly admitted evidence concerning a murder defendant's second confession, made voluntarily after a waiver of rights, where a first confession was taken in violation of *Miranda*. Although defendant was in custody when he made his first, unwarned incriminating statement, that confession was made without coercion or other circumstances intended to undermine the exercise of his free will. Therefore, under *Oregon v. Elstad*, 470 U.S. 298, the officers' failure

to advise defendant of his *Miranda* rights before he made his first confession did not taint his subsequent waiver of his constitutional rights.

**Am Jur 2d, Criminal Law § 797; Evidence § 537.**

**The progeny of Miranda v. Arizona in the Supreme Court. 46 L. Ed. 2d 903.**

5. **Evidence and Witnesses § 1227 (NCI4th) — murder — multiple confessions — state constitutional test**

The admission of a second confession to murder, made after *Miranda* warnings and a voluntary waiver of rights, did not violate the Constitution of North Carolina where a first confession had been obtained before *Miranda* warnings were given. The test applied by the Supreme Court of the United States in *Oregon v. Elstad*, 470 U.S. 298, is adopted for determining whether Article I, sections 19 and 23 of the North Carolina Constitution require the suppression of a defendant's second confession, made after proper warnings and the defendant's voluntary waiver of his constitutional rights, when that confession follows an earlier confession which must be excluded under *Miranda*.

**Am Jur 2d, Criminal Law §§ 941, 988; Evidence § 537.**

6. **Evidence and Witnesses § 162 (NCI4th) — murder — defendant's threats to potential witness — relevant — failure to hold voir dire — no error**

The trial court did not err in a murder prosecution by overruling defendant's objection and by denying his request for a voir dire when the prosecutor asked defendant's brother "What, if anything, threatening did your brother do to you about whether or not you were to tell the truth or testify about this matter?" The form of the question made clear that the expected testimony would relate to threats made by defendant regarding actions defendant would take if his brother told the truth or testified against him. An attempt by a defendant to intimidate a witness in an effort to prevent the witness from testifying or to induce the witness to testify falsely in his favor is relevant to show defendant's awareness of his guilt. Given the specific basis for the defendant's objection

and request for a voir dire hearing, the trial court did not err by overruling the objection and denying the request.

**Am Jur 2d, Evidence § 293.**

Appeal of right by the defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a life sentence for first-degree murder, entered on 2 July 1991 by Freeman, J., in Superior Court, Alexander County, upon a jury verdict of guilty. Heard in the Supreme Court on 12 January 1993.

> *Michael F. Easley, Attorney General, by Robert J. Blum, Special Deputy Attorney General, for the State.*

> *Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for the defendant.*

MITCHELL, Justice.

The defendant was indicted by the grand jury of Davie County on 8 October 1990 for the first-degree murder of Misti Ann Mathena. The defendant's motion for a change of venue was allowed, and the case was transferred to Alexander County. The defendant was tried capitally, and the jury found the defendant guilty of first-degree murder. Following the capital sentencing proceeding, the jury recommended that the defendant be sentenced to life imprisonment. The trial court sentenced the defendant to life imprisonment on 2 July 1991.

Before trial, the defendant moved to suppress certain incriminating statements which he had made to law enforcement officers. Following a hearing, the trial court made findings of fact and denied the defendant's motion to suppress.

The defendant presented no evidence at trial. The State's evidence tended to show the following. The fourteen-year-old victim, Misti Ann Mathena, was found dead in her family's mobile home in Mocksville, North Carolina, at approximately 4 p.m. on 4 September 1990. Law enforcement officers found the victim lying on her back on the living room floor. She had been shot three times: once in the head, once in the upper back, and once in the elbow. In their search of the residence, investigators discovered two .22-caliber shell casings, a live .22-caliber round, the victim's diary, and several love notes which referred to the defendant, Richie Hicks, and the victim.

Special Agent William R. Foster of the State Bureau of Investigation testified that he and Detective Lieutenant John Stephens of the Davie County Sheriff's Department interviewed the seventeen-year-old defendant in Foster's car, near the defendant's residence, at 12:08 a.m. on 5 September 1990. The defendant's family lived near the victim's family in the La Quinta trailer park. During this interview, the defendant stated that he and the victim had dated for about eight months and that they had broken up on Saturday, 1 September 1990, because they had been spending too much time together. The defendant explained that he had shared a bedroom with the victim in her parents' trailer until 31 August 1990, when the victim's mother had "kicked him out." He stated that he had returned to the victim's home on 3 September 1990 in order to collect his belongings. He talked to the victim at that time. He also told Agent Foster that the victim had started dating another boy a few days before her death. The defendant stated that he did not walk past the victim's trailer on the morning of her death, that he returned home from school that day at about 3 p.m., and that he knew nothing of the killing until a neighborhood child reported it to him. When asked if he knew of anyone who might want to hurt the victim, he indicated that an ex-boyfriend of the victim's sister had threatened the family in the past and that the ex-boyfriend had been seen in the trailer park on the day before the killing.

Agent Foster next saw the defendant at 6 p.m. on 5 September 1990. The defendant was standing outside the victim's trailer at this time, and Agent Foster asked him to retrace the path that he had taken on his way to the school bus the day before. The defendant agreed. After the defendant showed Agent Foster where he had walked on the morning of the killing, Agent Foster took the defendant back to the trailer where he had picked him up and let him out of the car.

At about noon on Thursday, 6 September 1990, Agent Foster and Lieutenant Stephens located the defendant at a funeral home in Mocksville. The defendant was with Bobby Mathena, the victim's brother. The officers asked the defendant and Bobby Mathena to come to the sheriff's department for further questioning, and the two boys agreed. About ten minutes later, the defendant and Bobby Mathena arrived at the sheriff's department in Bobby Mathena's car. The defendant repeated his earlier account of his whereabouts and contacts with the victim in the days preceding her death,

again stating that he had gone to school as he normally did on the day of her death and that he did not go anywhere near the victim's trailer on the morning of 4 September 1990.

During this interview at the sheriff's department, Agent Foster told the defendant that, because he and the victim had just broken up before the murder, he was a possible suspect. Agent Foster asked the defendant if he would cooperate by taking a polygraph test to eliminate himself as a suspect. The defendant stated that he wanted to cooperate, but that he wanted to talk to his father before agreeing to take the polygraph test. Agent Foster told the defendant that, because he was a minor, the officers would have to get his parents to sign a parental consent form before he could take the polygraph test. The defendant agreed that they should talk to his father. The officers took the defendant to his family's home, where the defendant's father signed a polygraph consent form at approximately 1 p.m.

After the defendant's father had signed the polygraph consent form, Agent Foster and Lieutenant Stephens took the defendant to the S.B.I. office in Hickory to take the polygraph test. They arrived in Hickory at 3 p.m., and the defendant waited in the lobby of the S.B.I. office while the officers went through a security door and into the area where individual offices were located. At about 5 p.m., Agent Foster asked the defendant to follow him through the security door and into the office of Special Agent J. L. Jones, the polygraph officer.

Agent Foster left the defendant in that office and next saw him at about 6:15 p.m., when the defendant walked down the hall and asked to speak to Agent Foster privately. The defendant told Agent Foster that Special Agent Jones had called him a liar and had made him mad. The defendant then stated that he was sorry and asked to speak to Agent Jones again. Agent Foster asked Agent Jones to come into the room and talk to the defendant, and Agent Foster left.

Agent Foster next saw the defendant at approximately 6:55 p.m., when he saw Agent Jones and the defendant walk outside into the parking lot. Jones and the defendant talked and then came back into the building, and Agent Foster followed them into the computer room. Over the defendant's objection, Agent Foster testified that at this time, the defendant was stating that he wanted to take the blame and that he was "responsible for it." He said

that he had shot the victim and told the officers that he would sign whatever they wanted him to and that he wanted to die and be with the victim. Agent Foster and Lieutenant Stephens told the defendant that they could not just write out a statement and have him sign it, and they told the defendant that they wanted the truth about what had happened. The defendant asked if he could take a polygraph test to prove that he had killed the victim, and Agent Foster left to see if he could find someone other than Agent Jones to administer a polygraph test.

At approximately 8:40 p.m., Agent Foster walked back into the computer room, and Lieutenant Stephens informed him that the defendant had confessed to the killing and had stated that his brother, Danny Hicks, had known that the defendant had planned to commit the murder and that he had carried out those plans. The defendant had told the officers that he took a rifle and hid it in the woods the day before the murder. On the morning of 4 September 1990, he went into the trailer, shot the victim, threw the rifle into some weeds outside the trailer, and then went on to school. After school that afternoon, he and Danny Hicks buried the rifle case and the rest of the ammunition.

Agent Foster asked the defendant if he wanted to tell the complete truth, and the defendant stated that he did. Lieutenant Stephens then advised the defendant of his constitutional rights. After waiving his rights, the defendant made the following statement.

The defendant said that he and the victim broke up on Saturday, 1 September 1990. He called her on Sunday at about noon, and she told him that she was dating someone else. When he hung up the telephone, he hit a wall in the kitchen and made a hole in it.

The defendant stated that on Monday, 3 September 1990, he went to the victim's trailer to gather up some of his belongings. After he left her trailer, he went home and called the victim. She told him not to call her any more; when he asked her if making love meant anything to her, she said yes, and again told him not to call her any more. The defendant told the officers that at that point, he started thinking about another boy touching her, and he "went to pieces." He went into his brother Danny's bedroom and told Danny that he could not handle it and that he was going to have to get rid of her. Danny said that he "didn't give a sh--."

The defendant stated that Danny and the victim had never gotten along.

The defendant said that he told Danny that he was going to leave the gun in the woods, and Danny went with him. They left the gun in the woods behind the victim's house at about 9:45 or 10:00 p.m. The defendant told Danny that he was going to shoot the victim at her home the next morning.

The defendant stated that on the morning of 4 September 1990, he and Danny left the house at about 6:15 a.m. Before they got to the victim's trailer, they split up. The defendant turned and went into the woods, and Danny went to the bus stop. The defendant walked into the woods behind the victim's home and waited for her sisters to leave. He knew the sisters were gone when he heard the bus go by. He then picked up the rifle and entered the Mathenas' trailer through the back door. He turned on the stereo in the victim's room and started to walk toward the living room, where he met the victim. The defendant stated that they looked at each other without saying anything, and he shot her. She looked at him and turned around, and he shot her in the back. She fell to the floor and put her hands over her face, and he shot her in the head. The defendant pointed to his right temple area to describe to the officers where he had shot her. He stated that he thought that he had shot her three times.

The defendant stated that he went out the back door and ran into the woods behind the trailer. He crossed two barbed wire fences, and he tossed the gun over a fence into some weeds. He took off the winter gloves that he was wearing and threw them into the woods. One glove landed in a tree, and he did not bother to get it out.

The defendant stated that he then caught a ride to school with a friend. When he got to school, he waited for Danny. When Danny saw him, Danny asked, "Richie, did you do it?" The defendant answered that he had and asked Danny what he thought about it. Danny responded, "I don't give a sh--." Danny asked where he had shot the victim, and the defendant responded by pointing to his head.

When the boys got home from school, the defendant told Danny that they had to get rid of the gun case and bullets, which were hidden in a pump house. Danny agreed with the defendant, and

the two of them went to the pump house. The defendant stated that he and Danny buried the gun case by a lake.

When asked why he shot the victim, the defendant said that when he and Misti were going together, his mother had tried to get the two of them to love her. He and his mother never got along. When he told his mother that he and Misti were breaking up, his mother was not interested in him any more. She started spending time with Misti, which made him jealous.

The defendant also stated that he was in the trailer for a few minutes before he shot Misti. He stated that he was afraid that if he did not go through with the shooting, she would tell on him and he would be arrested for pointing a gun at her. He said that he was sorry that this had happened and that, if he got a chance, he was going to kill himself the way the victim had been killed.

After the defendant made this statement, the officers arrested him and took him back to Mocksville. That night, the defendant showed police where he had hidden the rifle, and the rifle was recovered. A fired cartridge was jammed in the rifle when it was found. The next day, officers returned to the site and located the gloves which the defendant had discarded. The defendant also drew a map to show officers where he had hidden the gun case and ammunition.

A pathologist testified that the victim suffered three gunshot wounds and died as a result of gunshot wounds in the forehead and upper back. Two bullets were recovered from the body. A firearms expert testified that he could not conclusively determine whether the recovered bullets had been fired from the defendant's gun. The expert did testify that two empty cartridge casings found at the scene of the killing were fired from the defendant's gun.

Special Agent Steven Cabe of the State Bureau of Investigation testified that the defendant's fourteen-year-old brother, Danny Hicks, had been charged with murder, accessory to murder, and aiding and abetting the murder of Misti Mathena, and that Danny Hicks' case was pending in Juvenile Court. Agent Cabe testified on direct examination that Danny Hicks had made a statement on 6 September 1990 at 10 p.m. The defendant's counsel, on cross-examination, asked Agent Cabe to read that statement. Agent Cabe read the 6 September 1990 statement of Danny Hicks, which was

consistent with the incriminating statements made by the defendant and previously admitted into evidence. Danny also told the officers during this statement that he had wanted to call the police but had been afraid of what the defendant might do to him.

Agent Cabe testified that he talked to Danny Hicks again on 7 September 1990 at 12:35 a.m. During this interview, Danny stated that he and the defendant had gone to the pond behind their father's house when they returned from school on the afternoon of the shooting and that the defendant had buried the gun case then.

In an earlier interview on 5 September 1990 at 5:30 p.m., before the defendant was arrested, Danny had told officers that the defendant was with him on the morning of 4 September 1990 and could not have killed the victim. Danny also had told the officers that he had heard that an ex-boyfriend of one of the victim's sisters had threatened the Mathena family.

Danny Hicks testified at trial that the defendant had threatened him and had told him that, if he told anyone about what the defendant had done, the defendant would deny it and would kill him. Danny testified that the defendant had knocked him to the floor, was straddling him and was holding a steak knife in the air when he made these threats.

The defendant assigns as error the admission into evidence of two incriminating statements which he made to law enforcement officers at the S.B.I. office in Hickory on 6 September 1990. He argues that the first incriminating statement, which he made after speaking with Agent Jones in the parking lot and before he was advised of his constitutional rights, was admitted into evidence in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). He also contends that his second statement was admitted into evidence in violation of the rule set forth in *Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222 (1985), and in violation of Article I, sections 19 and 23 of the Constitution of North Carolina.

Before trial, the trial court held a *voir dire* hearing to determine the admissibility of these two incriminating statements. After hearing evidence presented by both the defendant and the State, the trial court made the following findings of fact regarding the defendant's incriminating statements to police officers.

The trial court found that after the defendant had reported voluntarily to the sheriff's department for questioning, officers asked him to take a polygraph test "in order to clear his name," and he agreed. Officers transported the defendant from Mocksville to Hickory for the purpose of administering a polygraph test; this trip took approximately two hours, although the officers did stop for lunch on the way. After the officers and the defendant arrived at the S.B.I. office in Hickory at approximately 3 p.m., the defendant waited in the lobby until approximately 5 p.m., when Agent Jones, a polygraph operator, arrived. The defendant told Agent Jones at least three times that he did not want to take a polygraph test. No evidence was presented at the *voir dire* hearing which indicated, and the trial court did not find, that officers ever offered to take the defendant home or that the defendant ever was told that he was free to leave.

The trial court found that after the defendant refused to take the polygraph test the third time, he told Agent Jones that he would like to go outside. During his conversation with Agent Jones in the parking lot, the defendant told Jones that he would like to take responsibility for the killing of the victim. The defendant and Agent Jones then came back inside the building, and Agent Jones told Agent Foster and Lieutenant Stephens that the defendant wanted to confess to the crime. When the defendant refused to elaborate on the details of the crime, the officers told him that he would have to tell them what had happened and any details that he knew. The defendant then gave them details of what had happened and demonstrated how he had shot the victim. After the defendant explained details of the murder, the officers advised the defendant of his constitutional rights, and the defendant then gave another confession.

Based on its findings of fact, the trial court concluded that, although the defendant had been questioned prior to his first incriminating statement to officers, he was not in custody when he made that statement. The court further concluded that after the defendant was warned of his rights at 8:45 p.m., he voluntarily, knowingly, and intelligently waived those rights and voluntarily confessed to the crime.

[1] While the findings of fact made by the trial court following the *voir dire* hearing on the admissibility of his confessions are conclusive and binding on this Court if they are supported by

competent evidence, the trial court's conclusion that the defendant was not in custody when he made his first incriminating statement to officers is a conclusion of law and is fully reviewable by this Court on appeal. *State v. Mahaley,* 332 N.C. 583, 592-93, 423 S.E.2d 58, 64 (1992). In the present case, the trial court's findings of fact are supported by ample evidence presented in the *voir dire* hearing. We are thus bound by those findings of fact. Upon reviewing the trial court's conclusions of law, however, we conclude that the trial court erred in holding that the defendant's first confession was admissible. We hold that the facts as found by the trial court require the conclusion that the defendant was in custody when he made the first incriminating statement and that this statement therefore was admitted in violation of *Miranda.*

In *Miranda,* the Supreme Court of the United States prohibited the prosecution's use of statements "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 16 L. Ed. 2d at 706. In the present case, the question is whether the defendant was in custody when he made an incriminating statement before he had been advised of his constitutional rights.

As we frequently have stated in the past, "the test for whether a person is 'in custody' for *Miranda* purposes is whether a reasonable person in the suspect's position would feel free to leave" or would feel "compelled to stay." *State v. Torres,* 330 N.C. 517, 525, 412 S.E.2d 20, 24 (1992), *cited in State v. Mahaley,* 332 N.C. 583, 591, 423 S.E.2d 58, 63 (1992); *see United States v. Mendenhall,* 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509 (1980); *Oregon v. Mathiason,* 429 U.S. 492, 494-95, 50 L. Ed. 2d 714, 719 (1977). Applying this objective test requires us to consider the particular facts and circumstances of each case. *Mahaley,* 332 N.C. at 591, 423 S.E.2d at 63 (citing *State v. Davis,* 305 N.C. 400, 410, 290 S.E.2d 574, 580 (1982)).

We hold that a reasonable person in the defendant's position would have felt that he was in custody and was not free to leave. Officers asked the defendant to take a polygraph test to "clear his name" and transported the defendant over an hour's drive away from his home in Mocksville to an S.B.I. office in Hickory for the purpose of administering a polygraph test. Although he refused to take the polygraph on three separate occasions during

STATE v. HICKS

[333 N.C. 467 (1993)]

two hours of questioning, the defendant never was taken home or offered transportation home. *See State v. Phipps*, 331 N.C. 427, 442, 418 S.E.2d 178, 186 (1992) (defendant not in custody when, during previous, similar interview, he was taken home upon refusing to take polygraph); *Davis*, 305 N.C. at 415-17, 290 S.E.2d at 584-85 (same). Additionally, although the polygraph operator informed the defendant during an explanation of the polygraph procedure that he was not under arrest, the defendant never was told that he was free to leave. *See Torres*, 330 N.C. 517, 526, 412 S.E.2d 20, 25; *see also Phipps*, 331 N.C. at 443, 418 S.E.2d at 186 (defendant not in custody when he was told that he was free to leave). Under the totality of the circumstances, a reasonable person in the defendant's position, knowing that he was a suspect in a murder case and having just stated to a law enforcement officer that he wanted to take responsibility for that murder, would feel that he was compelled to stay, not that he was free to leave. We conclude that the defendant was in custody for *Miranda* purposes immediately following his statement to Agent Jones that he would "take responsibility" for the killing and that, after he made this statement, the defendant should have been informed of his *Miranda* rights before officers questioned him further. The confession resulting from the unwarned, custodial interrogation following his statement that he would "take responsibility" for the killing should have been suppressed.

[2] The trial court's admission into evidence of the defendant's first confession in violation of *Miranda* is subject to harmless-error analysis. Before we can conduct such analysis, however, it is necessary that we determine which of the standards of harmless-error review contained in N.C.G.S. § 15A-1443 must be applied to this error. In several opinions this Court has implied that, where the prophylactic *Miranda* rule has been violated, the State must bear the burden of proof applicable under N.C.G.S. § 15A-1443(b) to errors arising under the Constitution of the United States, which requires the State to demonstrate that the error was harmless beyond a reasonable doubt. *E.g., State v. Greene*, 332 N.C. 565, 578, 422 S.E.2d 730, 737 (1992) (concluding that admission of a confession taken in violation of *Miranda* was harmless beyond a reasonable doubt, without directly holding that standard to be required); *State v. Washington*, 330 N.C. 188, 410 S.E.2d 55 (1991) (*per curiam* opinion reversing the decision of the Court of Appeals in *State v. Washington*, 102 N.C. App. 535, 402 S.E.2d 851 (1991),

on the basis of a dissent filed in the Court of Appeals which applied the heightened standard of review of N.C.G.S. § 15A-1443(b) ); *State v. Crawford*, 301 N.C. 212, 270 S.E.2d 102 (1980) (admission of confession, even if in violation of *Miranda*, was harmless beyond a reasonable doubt); *State v. Siler*, 292 N.C. 543, 234 S.E.2d 733 (1977) (admission of confession taken in violation of *Miranda* held harmless beyond a reasonable doubt, without directly holding that standard required). In none of those cases, however, did we analyze why the standard of harmlessness "beyond a reasonable doubt" was the appropriate standard to apply. We attempt to do so now.

It is well established that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11 (1967); N.C.G.S. § 15A-1443(b) (1988). On the other hand, for errors relating to rights arising other than under the Constitution of the United States, the defendant has the burden of establishing prejudice by showing that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a) (1988). Therefore, if the admission of this defendant's first confession, given without the benefit of *Miranda* warnings, did not violate the Constitution of the United States, the State need not establish harmlessness beyond a reasonable doubt and, instead, the defendant must prove prejudice.

The Supreme Court of the United States has stated that:

The Miranda exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer Miranda warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda. Thus, in the individual case, Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm. See New York v Quarles, supra at 654, 81 L Ed 2d 550, 104 S Ct 2626; Michigan

STATE v. HICKS

[333 N.C. 467 (1993)]

v Tucker, 417 US 433, 444, 41 L Ed 2d 184, 94 S Ct 2357 (1974).

*Oregon v. Elstad*, 470 U.S. 298, 306-307, 84 L. Ed. 2d 222, 230-31 (1985) (footnote omitted). Despite our giving the greatest deference to the Supreme Court of the United States and its decisional law, we are unable to believe that this statement in *Elstad* means what it seems so clearly on its face to declare. We respectfully suggest that even the Supreme Court of the United States does not have the constitutional authority — although it may have the raw power — to require that this or any other state court exclude evidence from a criminal trial, unless the use of that evidence violates the Constitution of the United States. *Elstad*, 470 U.S. at 370-71, 84 L. Ed. 2d at 272 (Stevens, J., dissenting). Accordingly, we must assume that states are required by *Miranda* to exclude unwarned statements resulting from custodial interrogation only because such an exclusion is required by the Constitution of the United States. Based on our assumption that the *Miranda* exclusionary rule is required by the Constitution of the United States, we conclude that the burden is upon the State in this case to establish that the admission of this defendant's first confession, which he made without benefit of *Miranda* warnings, was harmless beyond a reasonable doubt.

[3] We next turn to the issue of whether the admission of this defendant's first confession in violation of the *Miranda* exclusionary rule was harmless beyond a reasonable doubt. In his second confession, which we will conclude at a later point in this opinion was properly admitted at trial, the defendant admitted his guilt and gave a more detailed description of the crime than he had given in his first confession. The defendant also showed the officers where he had hidden the gun he had used to kill the victim, which was recovered, and drew a map showing officers where he had hidden the gun case and ammunition. Furthermore, evidence of a detailed statement made by the defendant's brother, Danny Hicks, was properly introduced and was consistent with the defendant's second confession. Considering the extremely incriminating evidence properly admitted at trial, we conclude that the admission of the defendant's first confession in violation of the *Miranda* exclusionary rule was harmless beyond a reasonable doubt.

[4] The defendant next argues that his second confession, made after he had been given the *Miranda* warnings and had waived

**STATE v. HICKS**

[333 N.C. 467 (1993)]

his constitutional rights, was admitted into evidence in violation of the rule established by the Supreme Court of the United States in *Elstad*. The defendant further argues that the admission of this second confession violated his rights under Article I, sections 19 and 23 of the Constitution of North Carolina. We disagree with these arguments.

In *Elstad*, the Supreme Court of the United States held that a defendant's waiver of rights and confession, following an initial confession taken in violation of *Miranda*, is tainted if the initial confession resulted in fact from "deliberately coercive or improper tactics." 470 U.S. at 314, 84 L. Ed. 2d at 235. The Court further held, however, that such subsequent confessions, made by the defendant after a voluntary and informed waiver of rights, need not be suppressed unless his first confession was both taken in violation of *Miranda* and taken in violation of the defendant's constitutional right against compelled self-incrimination. *Id.* at 307-309, 84 L. Ed. 2d at 231-32. In *Elstad*, the Court stated that

> [i]t is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Id.* at 309, 84 L. Ed. 2d at 232, *quoted in State v. Barlow*, 330 N.C. 133, 139, 409 S.E.2d 906, 910 (1991). Thus, if the defendant in fact made his first statement voluntarily and without actual coercion, his subsequent voluntary and informed waiver is untainted, and the statement which he made after receiving *Miranda* warnings and voluntarily waiving his rights may properly be admitted into evidence.

When determining the voluntariness of a confession, we examine the "totality of the circumstances surrounding the confession." *Barlow*, 330 N.C. at 140-41, 409 S.E.2d at 911 (citing *State v. Richardson*, 316 N.C. 594, 601, 342 S.E.2d 823, 829 (1986) ). The following factors are among those to be considered in determining whether a confession was voluntarily made: (1) whether the defendant was in custody when he made the statement; (2) the mental capacity of the defendant; (3) the presence of psychological coercion, threats, or promises; and (4) physical torture. *Id.* (citing *State v. Gray*, 268 N.C. 69, 78, 150 S.E.2d 1, 8 (1966), *cert. denied*, 386

U.S. 911, 17 L. Ed. 2d 784 (1967)). Also properly considered are the physical environment in which the interrogation was conducted and the manner of the interrogation. *Elstad*, 470 U.S. at 315, 84 L. Ed. 2d at 236.

Although the defendant was in custody when he made his first, unwarned incriminating statement, the custodial situation was not inherently coercive. *See Barlow*, 330 N.C. at 141, 409 S.E.2d at 911. Prior to being taken into custody, the defendant voluntarily reported to the sheriff's department for questioning and voluntarily accompanied officers to Hickory for polygraph testing. When explaining the polygraph procedure to the defendant, Agent Jones advised the defendant that he was not under arrest. Evidence presented by the defendant at the suppression hearing did indicate that the defendant had attended summer school to catch up in school and that he had not done well in school since he was a junior-high-school student. However, he was in the twelfth grade at the time of the murder and had never repeated a grade. The trial court found, based upon competent, substantial evidence, that officers used no threats, promises, or force during the questioning of the defendant and that no weapons were displayed during the questioning. Furthermore, officers bought lunch for the defendant before taking him to the S.B.I. office in Hickory, and the defendant was allowed to sleep during the car ride and while waiting for the polygraph operator to arrive. Based on the totality of the circumstances, we conclude that the defendant's unwarned confession was made without coercion or other circumstances intended to undermine the exercise of his free will. Therefore, under *Elstad*, the officers' failure to advise the defendant of his *Miranda* rights before he made his first confession did not taint his subsequent waiver of his constitutional rights. The trial court properly admitted evidence concerning the defendant's second confession, which he made voluntarily after he had been advised of his constitutional rights and had voluntarily waived those rights.

[5] The defendant also argues that, even if his second confession is admissible under *Elstad*, Article I, sections 19 and 23 of the Constitution of North Carolina require its suppression. We note that, "[i]n construing provisions of the Constitution of North Carolina, this Court is not bound by opinions of the Supreme Court of the United States construing even identical provisions in the Constitution of the United States." *State v. Arrington*, 311 N.C. 633, 642, 319 S.E.2d 254, 260 (1984) (citing *White v. Pate*, 308 N.C. 759,

304 S.E.2d 199 (1983); *Bulova Watch Co. v. Brand Distributors, Inc.,* 285 N.C. 467, 206 S.E.2d 141 (1974) ); *see also State v. Carter,* 322 N.C. 709, 713, 370 S.E.2d 553, 555 (1988). We do, however, give great weight to decisions of the Supreme Court of the United States interpreting provisions of the Constitution of the United States which are parallel to provisions of the State Constitution to be construed. *Arrington,* 311 N.C. at 643, 319 S.E.2d at 260.

Article I, section 19 of the Constitution of North Carolina provides in part that "[n]o person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." In this context, the term "law of the land" is synonymous with the term "due process of law" in the Constitution of the United States, but when applying the "law of the land" clause this Court is not bound by decisions of the Supreme Court of the United States interpreting the Fourteenth Amendment. *Bulova Watch Co.,* 285 N.C. at 474, 206 S.E.2d at 146; *see University of North Carolina v. Foy,* 5 N.C. (1 Mur.) 57 (1805).

Article I, section 23 of the Constitution of North Carolina provides that

[i]n all criminal prosecutions, every person charged with crime has the right to be informed of the accusation and to confront the accusers and witnesses with other testimony, and to have counsel for defense, and not be compelled to give self-incriminating evidence, or to pay costs, jail fees, or necessary witness fees of the defense, unless found guilty.

Although the language of this provision differs from the language of the Fifth Amendment to the Constitution of the United States, both provisions guarantee an accused the right to be free from compelled self-incrimination.

The proper tests to be used in resolving questions arising under the Constitution of North Carolina can be determined with finality only by this Court. *Arrington,* 311 N.C. at 643, 319 S.E.2d at 260. However, we adopt the test applied by the Supreme Court of the United States in *Elstad* for our use in determining whether Article I, sections 19 and 23 of the Constitution of North Carolina require the suppression of a defendant's second confession, made after proper warnings and the defendant's voluntary waiver of

his constitutional rights, when that confession follows an earlier confession which must be excluded under *Miranda*. When the *Elstad* test is applied in the present case, the defendant's claim that the admission of his second confession violated his rights under the Constitution of North Carolina is without merit.

[6] The defendant next assigns as error the trial court's failure to hold a *voir dire* hearing to determine the admissibility of testimony to be given by the defendant's brother, Danny Hicks. At trial, the State called Danny Hicks as a witness. During the direct examination of Danny Hicks, the prosecutor asked, "What, if anything, threatening did your brother do to you about whether or not you were to tell the truth or testify about this matter?" The defendant objected and moved for a *voir dire* hearing on the admissibility of Danny Hicks' response to this question; the defendant based this objection and request for a *voir dire* solely on the ground that any such evidence was not relevant. The trial court overruled the defendant's objection and denied his request for a *voir dire*. Danny Hicks then testified that the defendant had pushed him to the floor, held a steak knife over him, and threatened to kill him if he told anyone what the defendant had done.

The form of the prosecutor's question made clear to the trial court that the expected testimony of Danny Hicks would relate to threats made by the defendant regarding actions he would take if Danny told the truth or testified against him. An attempt by a defendant to intimidate a witness in an effort to prevent the witness from testifying or to induce the witness to testify falsely in his favor is relevant to show the defendant's awareness of his guilt. *State v. Minton*, 234 N.C. 716, 723-24, 68 S.E.2d 844, 849 (1952); *State v. Smith,* 19 N.C. App. 158, 159, 198 S.E.2d 52, 53, *cert. denied*, 284 N.C. 123, 199 S.E.2d 662 (1973); N.C.G.S. § 8C-1, Rule 401 (1991); *see also State v. Canady*, 99 N.C. App. 189, 190, 392 S.E.2d 457, 457-58 (1990), *rev'd on other grounds*, 330 N.C. 398, 410 S.E.2d 875 (1991); *State v. Neagle,* 29 N.C. App. 308, 311, 224 S.E.2d 274, 275, *rev. denied*, 290 N.C. 665, 228 S.E.2d 456 (1976). Thus, the form of the question in the present case made it obvious that the testimony to follow would be relevant. Given the specific basis for the defendant's objection and request for a *voir dire* hearing in the present case, the trial court did not err by overruling the objection and denying the request. *See State v. Eppley,* 282 N.C. 249, 258-59, 192 S.E.2d 441, 447-48 (1972).

For the foregoing reasons, we conclude that the defendant's trial was free of prejudicial error.

NO ERROR.