**STATE v. BUNNELL**

[340 N.C. 74 (1995)]

━━━━━━━━━

STATE OF NORTH CAROLINA v. CHARLES TATE BUNNELL

No. 500A93

(Filed 7 April 1995)

**1. Homicide § 244 (NCI4th)— first-degree murder—premeditation and deliberation—evidence sufficient**

There was sufficient evidence of premeditation and deliberation in a first-degree murder prosecution where the State's evidence tended to show that the fourteen-year-old defendant and his girlfriend talked about running away; defendant said that he

would kill his abusive stepfather if his stepfather gave him any trouble; defendant entered the house, had a brief discussion with his stepfather, and went into the bedroom to get a wrench; defendant calmly picked up a .30-.30 rifle while in the bedroom, loaded it, raised it to his shoulder, and shot his stepfather in the back of the head; his girlfriend testified that there was no change in defendant's countenance after the killing; defendant did not appear to be angry or upset; he returned to the house to remove his stepfather's wallet and pocketknife and had enough composure to check the time of the shooting; he subsequently bought a can of deodorizer to remove the smell of the shooting from the truck; and he later disposed of the gun, wallet, pocketknife, and washed the blood off his hands at a Welcome Center.

**Am Jur 2d, Homicide §§ 437 et seq.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

2. **Evidence and Witnesses § 1305 (NCI4th)— first-degree murder—statement by youthful defendant—voluntariness**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to suppress a statement he had given to SBI agent Murphy where defendant placed great emphasis on his age and on his testimony that the warnings concerning his constitutional rights did not mean anything to him when he waived them, but the trial court found that defendant wanted to talk to agent Murphy, that he told Murphy that he understood each right he was waiving, that the agent had applied no pressure or coercion to defendant, the physical surroundings were not coercive, there was no evidence of a display of weapons, officers took defendant and his girlfriend to Burger King; officers carefully went over the juvenile rights form with defendant; defendant had failed three grades in school, but had made them up during summer school and could read at a ninth grade level; there was no showing of subnormal intelligence; defendant had an opportunity to sleep and eat before he was questioned; and defendant recited his constitutional rights when Florida officers began to read them to him.

**Am Jur 2d, Evidence § 745.**

**Voluntariness and admissibility of minor's confession. 87 ALR2d 624.**

STATE v. BUNNELL

[340 N.C. 74 (1995)]

Validity and efficacy of minor's waiver of right to counsel—modern cases. 25 ALR4th 1072.

3. Evidence and Witnesses § 1227 (NCI4th)— first-degree murder—defendant's statement—earlier unlawful statement

The trial court did not err in a first-degree murder prosecution by not excluding defendant's statement, which defendant claimed was tainted by an earlier statement which was excluded due to a violation of the juvenile code. A subsequent, valid waiver of rights is not tainted by an earlier, voluntary but improper waiver of these rights.

Am Jur 2d, Evidence § 730.

4. Appeal and Error § 150 (NCI4th)— first-degree murder—statement by defendant—right to counsel—first raised on appeal

A first-degree murder defendant's contention that his statement was obtained in violation of the Sixth Amendment of the United States Constitution and Article I, Section 23 of the North Carolina Constitution was rejected because defendant raised it for the first time on appeal.

Am Jur 2d, Appeal and Error §§ 545 et seq.

5. Homicide § 558 (NCI4th)— first-degree murder—refusal to submit voluntary manslaughter—conviction for first-degree murder

There was no prejudicial error in a first-degree murder prosecution where the court refused to submit a voluntary manslaughter instruction to the jury but the jury was instructed on first and second degree murder and convicted defendant of first-degree murder.

Am Jur 2d, Homicide §§ 525 et seq.

Lesser-related state offense instructions: modern status. 50 ALR4th 1081.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Hobgood, J., at the 28 June 1993 Criminal Session of Superior Court, Bladen County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional

STATE v. BUNNELL

[340 N.C. 74 (1995)]

judgment imposed for the unauthorized use of a conveyance was allowed 8 March 1994. Heard in the Supreme Court 15 February 1995.

*Michael F. Easley, Attorney General, by Joan Herre Byers, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for the defendant-appellant.*

MITCHELL, Chief Justice.

Defendant, a fourteen-year-old, was charged with first-degree murder and robbery with a dangerous weapon. After a finding of probable cause, he was bound over to the Superior Court. Defendant was tried noncapitally to a jury and found guilty of first-degree murder on the basis of premeditation and deliberation, but was adjudged not guilty under the theory of felony murder. Defendant was found not guilty of robbery with a dangerous weapon but guilty of unauthorized use of a conveyance. Judge Hobgood sentenced defendant to life imprisonment for the first-degree murder conviction and not less than one year nor more than two years for the unauthorized use of a conveyance conviction, the sentences to run concurrently.

The State's evidence tended to show that fourteen-year-old defendant, Charles Bunnell, lived with his mother Freda and his stepfather, Douglas Evers. Evers worked twelve hours a day in a textile mill. When he was not at work, he drank heavily and then abused the family members. As a result of Evers' drinking, Freda moved out of the house and into an apartment.

On 22 April 1992, Freda picked up Evers at work at 6:00 p.m., drove him to a convenience store where he bought a case of beer, and then took him to his house. There she fixed everyone dinner and left the house for her apartment at 8:00 p.m. with defendant and defendant's fifteen-year-old girlfriend, Jamie Carter. Defendant and Jamie were outside the apartment until 9:30 p.m. During this time, they discussed taking Evers' truck and running away. At trial, Jamie testified that defendant said he would kill Evers if he gave defendant any trouble.

Defendant and Jamie returned to Evers' house at 9:40 p.m. to get some clothes for defendant. Evers began to yell at defendant because defendant had not returned by 9:30 p.m. Defendant told Evers he had said he would be home by 10:00 p.m., and Evers called defendant a

liar. Defendant then asked Evers if he could borrow a wrench to tighten the wheels on his skateboard. Evers asked if he would put it back, and defendant said he would. Evers again called defendant a liar.

Defendant went into Evers' bedroom, where the tools were kept. Evers had a number of rifles and a shotgun in the corner of his bedroom. Defendant picked up a .30-.30 rifle, loaded one bullet into the chamber, raised the rifle to his shoulder, and shot Evers in the back of the head. Defendant put the empty shell casing in his pocket and took the rifle out to the truck. Jamie asked what had happened, and defendant answered that he had just scared Evers. Jamie then asked defendant whether he had killed Evers, and defendant told her he had. Defendant reentered the house; took Evers' wallet, pocketknife, and truck keys; and packed some clothes. He and Jamie got into the truck and drove south. Defendant noted the time when he shot Evers because defendant knew he would be caught and "they" would want to know the time. It was 10:24 p.m.

During their escape, defendant disposed of the rifle, the spent shell casing and Evers' wallet and pocketknife at the South Carolina Welcome Center. Defendant and Jamie eventually decided to go to Daytona Beach, Florida. After reaching Daytona, defendant got into an accident which led to his arrest. During an interview with Florida and North Carolina law enforcement officers, defendant said he did not know he was going to shoot Evers until he actually did so. Defendant also helped police locate the evidence hidden at the Welcome Center.

Additional evidence introduced at trial will be discussed as necessary to an understanding of the issues.

[1] By his first assignment of error, defendant contends that there was insufficient evidence of intent to kill, premeditation, and deliberation to support his conviction for first-degree murder. Therefore, he contends that the trial court erred in denying his motion to dismiss that charge.

In ruling on a motion to dismiss, the trial court must determine whether there is substantial evidence of each element of the offense charged. *State v. McDowell*, 329 N.C. 363, 407 S.E.2d 200 (1991). The trial court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn from the evidence presented. *State v. Davis*, 325 N.C. 693, 386

STATE v. BUNNELL

[340 N.C. 74 (1995)]

S.E.2d 187 (1989). Evidence favorable to the State is to be considered as a whole, and the test of sufficiency to withstand the motion to dismiss is the same whether the evidence is direct, circumstantial, or both. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649 (1982).

"Murder in the first degree is the unlawful killing of another human being with malice and with premeditation and deliberation." *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). That the killing was unlawful and done with malice may be presumed from the use of a deadly weapon. *State v. Porter*, 326 N.C. 489, 391 S.E.2d 144 (1990). "Premeditation means that the act was thought out beforehand for some length of time, however short; but no particular amount of time is necessary for the mental process of premeditation." *State v. Gladden*, 315 N.C. 398, 430, 340 S.E.2d 673, 693, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986). "Deliberation means . . . an intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design . . . or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation." *State v. Sanders*, 276 N.C. 598, 615, 174 S.E.2d 487, 499 (1970), *death sentence reversed*, 403 U.S. 948, 29 L. Ed. 2d 860, *on remand*, 279 N.C. 389, 183 S.E.2d 107 (1971).

There is sufficient evidence of premeditation and deliberation in the present case to support defendant's first-degree murder conviction. The State's evidence tended to show that defendant and Jamie talked about running away together, and defendant said he would kill Evers if Evers gave him any trouble. The actions of defendant before and after the killing also provide evidence of premeditation and deliberation. Defendant entered the house, had a brief discussion with Evers, and then went into the bedroom to get a wrench. While in the bedroom, defendant calmly picked up a .30-.30 rifle, loaded it, raised the rifle to his shoulder, and shot Evers in the back of the head.

Jamie testified that there was no change in defendant's countenance after the killing. He did not appear to be angry or upset. Instead, defendant put the gun in the truck and returned to the house to remove Evers' wallet and pocketknife from his person. In fact, defendant had enough composure to check the exact time of the shooting. Afterwards, defendant bought a can of deodorizer to remove the smell of the shooting from the truck. Defendant later disposed of the gun, wallet, and pocketknife and washed the blood off his hands at the Welcome Center.

All of this evidence, when viewed in the light most favorable to the State, was clearly sufficient to support a finding of first-degree murder based on premeditation and deliberation. Accordingly, we overrule this assignment of error.

[2] By his second assignment of error, defendant contends that the trial court erred in denying his motion to suppress his 25 April 1992 statement to SBI Agent Neil Murphy. Defendant maintains the statement was not knowingly and voluntarily given and, therefore, was taken in violation of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 23 of the North Carolina Constitution.

Voluntariness must be determined by looking to the totality of the circumstances surrounding the statement. *State v. Mlo*, 335 N.C. 353, 440 S.E.2d 98, *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 841 (1994); *State v. Hicks*, 333 N.C. 467, 428 S.E.2d 167 (1993). Some important factors to be considered include (1) whether defendant was in custody, (2) defendant's mental capacity, (3) the physical environment of the interrogation, and (4) the manner of the interrogation. *State v. Hicks*, 333 N.C. at 482-83, 428 S.E.2d at 176. The State bears the burden of proving that a defendant made a knowing and intelligent waiver of his rights and that his statement was voluntary. *State v. Reid*, 335 N.C. 647, 440 S.E.2d 776 (1994).

Defendant places great emphasis on his age and on his testimony that the warnings concerning his constitutional rights did not mean anything to him when he waived them on 25 April 1992. However, the trial court found defendant wanted to talk to Agent Murphy, defendant told Agent Murphy that he understood each right he was waiving, and Agent Murphy had applied no pressure or coercion to defendant. The physical surroundings in which the interrogation took place were not coercive. Defendant was questioned in an office where pilots waited at the airport and while the officers and defendant waited to fly back to North Carolina. There was no evidence of any display of weapons. Prior to going to the airport, the officers took defendant and Jamie to Burger King. At the airport, the officers carefully went over the juvenile rights form with defendant.

Defendant had failed three grades in school; yet he had made them up during summer school and could read at a ninth grade level. There was no showing of subnormal intelligence. Defendant had an opportunity to sleep and eat before he was questioned. In addition, defendant seemed familiar with the *Miranda* warnings and recited

his constitutional rights when the Florida officers began to read them to him. The trial court did not err in its findings or in its conclusion that on the totality of the circumstances, the defendant's 25 April 1992 confession was voluntary.

[3] Defendant further argues that the statement taken on 25 April was tainted by an earlier unlawful statement taken on 23 April. The trial court excluded defendant's 23 April statement to Florida officers because of a technical violation of the Juvenile Code. N.C.G.S. § 7A-595(a)(3) requires any juvenile in custody to be advised prior to questioning of the "right to have a parent, guardian or custodian present during questioning." Because the Florida officers only warned defendant that he had the right to have a parent or guardian present and failed to add that he had the right to have a custodian present, the trial court concluded that he could not have knowingly and understandingly waived that right. Defendant's natural mother was only his custodian, since he had been legally adopted by his grandmother. Pursuant to the United States Constitution and the North Carolina Constitution, a subsequent, valid waiver of rights is not tainted by an earlier, voluntary but improper waiver of these rights. *Oregon v. Elstad*, 470 U.S. 298, 306-09, 84 L. Ed. 2d 222, 230-32 (1985); *State v. Hicks*, 333 N.C. at 481-82, 428 S.E.2d at 175-76. Therefore, this argument has no merit.

[4] Defendant also argues that the 25 April statement was inadmissible because it was obtained in violation of the Sixth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution. We note at the outset that defendant did not assert this issue in his motion to suppress the 23 April and 25 April statements. Rather, defendant raises it for the first time on appeal to this Court. Defendant contends that his right to counsel attached prior to the 25 April interrogation because sufficient adversary judicial proceedings had commenced in this case, he was already represented by counsel, and he did not validly waive his right to counsel. Having failed to attack the admissibility of his confession on this ground during the trial, defendant will not be allowed to attempt to do so for the first time on appeal to this Court. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). We specifically reject defendant's contention for this reason.

[5] By his final assignment of error, defendant contends that the trial court erred in refusing to submit a voluntary manslaughter instruction to the jury. Defendant argues that the following evidence presented at trial supported the submission of voluntary manslaughter

based on a heat of passion theory. Evers subjected defendant to twenty-two months of totally unjustified physical and mental abuse. Evers got drunk all the time and repeatedly physically assaulted defendant. Evers regularly yelled and cursed at defendant, saying that he "didn't have the brains God gave a monkey." Evers also repeatedly abused defendant's mother, his half-sister, and his half-sister's baby in front of defendant. On the night of the shooting, Evers "started fussing" at defendant and called him a liar. Defendant testified that he intended only to quietly run away, but then he completely lost control of reason and saw the rifle as he was picking up a wrench in Evers' bedroom. Seconds later, defendant dropped the wrench, picked up the rifle, and shot Evers. Defendant testified that he did not know he was going to shoot until the moment he did so and that he "couldn't face being put down any more."

Even assuming *arguendo* that, taken in the light most favorable to defendant, there was some evidence to support an instruction on voluntary manslaughter, the trial court's failure to give it was harmless error. In *State v. Shoemaker*, 334 N.C. 252, 432 S.E.2d 314 (1993), the trial court instructed the jury on first-degree and second-degree murder, and the jury returned a verdict of guilty of first-degree murder. The defendant argued that it was error for the trial court to refuse to instruct the jury on voluntary manslaughter. This Court stated:

> "A verdict of murder in the first degree shows clearly that the jurors were not coerced, for they had the right to convict in the second degree. That they did not indicates their certainty of [defendant's] guilt of the greater offense. The failure to instruct them that they could convict of manslaughter therefore could not have harmed the defendant."

*Id.* at 271, 432 S.E.2d at 324 (quoting *State v. Freeman*, 275 N.C. 662, 668, 170 S.E.2d 461, 465 (1969)). In this case, the jury was instructed that it could find defendant guilty of first-degree murder, second-degree murder, or not guilty. The jury returned a verdict of guilty of first-degree murder. Therefore, any error in the trial court's failure to instruct the jury on voluntary manslaughter was harmless and entitles defendant to no relief. This assignment of error is overruled.

For the foregoing reasons, we conclude that defendant received a fair trial free of prejudicial error.

No error.