STATE OF NORTH CAROLINA v. JOHN GADSDEN AND CARL GADSDEN

No. 112

(Filed 3 June 1980)

1. Homicide § 30.2— second degree murder case—instruction on manslaughter not required

    The trial court in a second degree murder case did not err in failing to charge the jury that it might find defendant, who offered no evidence in his own behalf, guilty of voluntary manslaughter, since evidence presented by the State tended to show that defendant was guilty of murder if he was guilty of anything, and evidence presented by a codefendant tended to show that defendant was not guilty of anything.

2. Criminal Law § 113.7— two defendants—acting in concert—instructions proper

    In a second degree murder prosecution of two defendants where voluntary manslaughter was submitted as an alternative verdict for only one defendant, there was no merit to defendant's contention that the trial court gave conflicting instructions concerning acting in concert to the jury, since the instructions about which defendant complained were given while the court was instructing on second degree murder, and the court subsequently clearly instructed on what the jury would have to find in order to return a verdict of guilty of second degree murder or voluntary manslaughter against defendant.

    Justice BROCK did not participate in the consideration or decision of this case.

APPEAL by defendants from *McLelland, J.,* 8 October 1979 Criminal Session, WAKE Superior Court.

Upon pleas of not guilty defendants were tried on bills of indictment charging them with the murder of Jerome Gordon. The cases were tried together and the state asked for no greater verdict than that of murder in the second degree.

Evidence presented by the state is summarized in pertinent part as follows:

On 5 May 1979 Eddie Jarman was "in charge" of a rooming house located at 202 Linden Avenue in Raleigh. His duties included collecting rent from tenants. Gordon lived in the house on the first floor and was scheduled to succeed Jarman as the house manager. Defendant John Gadsden rented a room or apartment on the second floor of the house and occupied it with his girl friend Francine Dantzler. Defendant Carl Gadsden is the brother

of defendant John, did not live at the house but visited his brother quite frequently.

Late in the afternoon of said date, Gordon was in his bathroom washing some shirts. Defendant John asked Gordon the whereabouts of "his sorry friend" who lived in Room 6 at the house. Gordon denied any friendship with the person referred to. Defendant John accused the person of stealing his television set and stated that he was going to get his boys together, come back and make somebody pay for it.

A short while later defendant John returned to the house and defendant Carl was with him. Defendant John asked Gordon again about his "friend" who lived upstairs. At that time defendant John had a butcher knife on his person. After a few words with Gordon defendants went upstairs. Shortly thereafter a lot of noise came from upstairs "as if somebody was tearing up the building."

Jarman went upstairs to investigate the cause of the noise and Gordon went with him. When they reached the second floor they found that the door to Room 6 had been broken down and the contents of the room disarranged. Defendants and Francine were close by and defendant John was fussing about what he was going to do "to the guy when he catch him"; defendant John had two butcher knives in his hand at the time and was "talking, walking and prancing."

Jarman decided to go downstairs and call the owner of the house. Gordon elected to stay upstairs and try to talk to the defendants. Defendant Carl had a pocketknife in his hand at that time.

After getting downstairs and calling the owner of the house, Jarman heard more noise from upstairs. Sensing trouble, he then called the police and also called for an ambulance. He went to the door of his room and saw defendants and Gordon run out of the house and into the street. Both defendants were stabbing Gordon with knives, defendant John stabbing him from his front and defendant Carl stabbing him from his back. Gordon had nothing in his hands and was quite intoxicated at the time.

After being stabbed numerous times by defendants, Gordon finally managed to get back to the porch of the house. Defendant

John called for Jarman to come outside "so I can give you some of this." As Gordon lay on the porch bleeding, defendants removed a television set and record player from the house, placed it in an automobile and they and Francine left.

Gordon was carried to Wake Medical Center in Raleigh where he died on an operating table at 7:50 p.m. An autopsy disclosed that Gordon had received ten cuts, three in the front portion of his body and seven in his back. Five of the cuts entered his body cavity and death resulted from internal bleeding caused from the severing of two major blood vessels inside of his body. A heavy content of alcohol, equivalent to a .30 reading on a breathalyzer machine, was found in the victim's blood.

Defendant John offered no evidence. Defendant Carl presented evidence, including his own testimony, which is summarized in pertinent part as follows:

On 5 May 1979 he was living in Raleigh with his grandmother on Oakwood Avenue. His parents lived in Philadelphia. He visited his brother, defendant John, at his apartment on Linden Avenue at various times and knew Jarman and Gordon when he saw them. Jarman, Gordon and other men "hung around" Rebecca Howard's home which was located next to the rooming house. Jarman was Rebecca's boyfriend and sold liquor. In April of 1979 she got mad with defendant Carl, threatened to have him "taken care of", and thereafter he was afraid that Jarman, Gordon and others would try to hurt him. On the following day defendant Carl purchased a knife.

At around 2:00 p.m. on the day in question defendant Carl went to his brother's apartment where the two of them and Francine watched television until about 3:30 p.m. Defendant John went to the kitchen to wash some glasses and when he did not return in a few minutes, defendant Carl went out into the hall to look for him. There he saw five men including Gordon standing around his brother. When defendant Carl asked his brother if he was okay, the men sort of dispersed and defendant John returned to his room. The five men came to the room door and one of them asked Gordon "is that the man", referring to defendant Carl. Gordon indicated that it was and the five left.

Some ten or fifteen minutes later defendants decided to walk to their grandmother's house. As they came down the stairs at the rooming house, they saw Jarman, Gordon and the other three men they had seen upstairs enter Rebecca Howard's house. After staying in the area of their grandmother's home for about forty-five minutes, they returned to the rooming house where Francine told them someone had entered their room and had taken the television, radio, a watch and a ring. At defendant John's request defendant Carl helped him search an adjoining room, the door to which was open. They failed to find the stolen property.

Defendants then decided to go and tell their grandmother what had happened. As they reached the top of the stairs and were about to descend, Gordon started coming up the stairs talking in a fairly loud voice. He said he wanted to talk to John, that he (Gordon) was the houseman now, and that he wanted John to get his stuff together and move. Gordon was talking in an "aggressive manner" and had a small paring knife in his hand.

Defendant Carl obtained his knife and told his brother that Gordon had a knife. Thereupon, Gordon swung the knife toward defendant John who pushed him away. Gordon then advanced toward defendant Carl with his knife raised. He threw his arms around defendant Carl who then grabbed Gordon's hand with the knife in it and with his knife in his other hand began stabbing Gordon in his back. The two of them "tussled" down the stairs and fell through the screen door onto the porch. The altercation continued on the porch, in the yard and onto Howard's porch with defendant Carl stabbing Gordon several times but never receiving any cut from Gordon. While defendant Carl and Gordon were fighting in the yard and on the Howard porch, defendant John was on the porch of the rooming house yelling to Gordon not to stab his brother. Defendant John did not have a knife in his hand at any time and inflicted no wound on Gordon.

Immediately after the fight, defendants and Francine left the rooming house and went to her sister's. They returned to the rooming house around 11:00 or 11:30 p.m. to get their belongings and defendants were arrested at that time.

On cross-examination defendant Carl stated that when he first saw that Gordon had a knife, defendant John was at the top of the stairs, Gordon was on the stairs "within striking distance

of him," and he (Carl) was about three-fourths of the way down the stairs; that defendant John pushed Gordon when he "started to swing a knife"; that Gordon then leaped (down the stairs) to defendant Carl; that he did not know where defendant John was after the cutting began until they were outside of the house and defendant John was yelling to Gordon not to stab his brother; and that defendant John "didn't come down the steps behind me . . . not that I know of."

As to defendant John, the court instructed the jury that it might return a verdict of guilty of second-degree murder or not guilty. As to defendant Carl, the jury was instructed to return a verdict of guilty of second-degree murder, manslaughter or not guilty. The jury returned verdicts finding both defendants guilty of second-degree murder.

With respect to defendant John, the court entered judgment imposing a prison sentence of not less than twenty years nor more than life. As to defendant Carl, the court entered judgment imposing a prison sentence of not less than fifteen years nor more than twenty-five years. Both defendants appealed.

This court allowed defendant Carl's motion to bypass the Court of Appeals. Defendant John's appeal was docketed in this court; we now consider the appeal as a motion to bypass the Court of Appeals and allow it.

*Attorney General Rufus L. Edmisten, by Associate Attorney Evelyn M. Coman, for the state.*

*Benjamin F. Clifton, Jr., for defendant-appellant John Gadsden, and Kyle S. Hall for defendant-appellant Carl Gadsden.*

BRITT, Justice.

### DEFENDANT JOHN GADSDEN'S APPEAL

[1] By his only assignment of error, defendant John contends the trial court erred in not submitting voluntary manslaughter as an alternative verdict as to him. He argues that if the jury had chosen to believe the state's evidence tending to show that he participated in the stabbing of Gordon, and then believed defendant Carl's testimony relating to self-defense, they could have

found him as well as his brother guilty of voluntary manslaughter. We find no merit in the assignment.

It is well settled that the trial court is not required to charge the jury upon the question of a defendant's guilt of lesser degrees of the crime charged in the indictment when there is no evidence to sustain a verdict of defendant's guilt of such lesser degrees. *State v. Redfern*, 291 N.C. 319, 230 S.E. 2d 152 (1976); *State v. Griffin*, 280 N.C. 142, 185 S.E. 2d 149 (1971); 4 Strong's N.C. Index 3d, Criminal Law § 115.

In the case at hand the trial court in instructing the jury gave both defendants the benefit of defendant Carl's testimony regarding self-defense. The court charged:

> If, however, you believe that John Gadsden did not stab Gordon and that Carl Gadsden, who did not provoke or voluntarily enter into the fight, believed it necessary to stab Gordon to save himself from death or great bodily harm, that the circumstances as they appeared to Carl Gadsden at the time were sufficient to create such a belief in the mind of a person of ordinary firmness, considering the size, age and strength of the defendant Carl Gadsden as compared to the size, age and strength of Jerome Gordon, and considering any weapon held by Gordon; and that in stabbing Gordon, Carl Gadsden did not use excessive force, that is, more force than reasonably appeared to him to be necessary to save himself from death or great bodily harm; then you will have determined that the killing was in self-defense, excused, and in that sense was lawful; your verdict as to each defendant in such case should be not guilty.

Thereafter, the court instructed the jury on the principles of heat of passion and excessive force and their relation to malice, a necessary element of second-degree murder. The instructions include the following:

> The State's evidence tends to show that there was no provocation of the defendants by Gordon; that the defendants acted in anger but not in the heat of passion as the law defines that state of mind.

> The evidence of the defendant Carl Gadsden tends to show that John Gadsden did not act at all against Gordon;

that Gordon aggressively demanded that John Gadsden move out of the rooming house, then swung at John Gadsden, then attacked Carl Gadsden, holding him by the neck with his arm. If you believe that these actions on the part of Gordon took place as defendant Carl Gadsden testified, and believe that they adequately provoked heat of passion in the mind of Carl Gadsden and that he began stabbing Gordon so soon after such provocation that such a passion in a person of average mind and disposition would not have cooled, then you will have determined that Carl Gadsden acted without malice in stabbing Gordon.

\* \* \*

As to the second rule mentioned earlier, one who does not provoke or voluntarily enter into a fight and who reasonably believes it to be necessary to stab another to save himself from death or great bodily harm, is not excused by the law of self-defense if that stabbing is more force than reasonably appeared to the accused to be necessary.

It is for you the jury to say whether you find the true circumstances to be as recounted by the defendant Carl Gadsden, the force used, that is stabbing, reasonably appeared to Carl Gadsden to be necessary. If you believe the force used did reasonably appear to Carl Gadsden to be necessary, it was not excessive, then the killing is excused by the law of self-defense. If, however, you believe that it did not reasonably appear to him to be necessary to use that force, that is stabbing, it was excessive and the killing is not excused by the law of self-defense but it is without malice, then it is not second degree murder.

We hold that the trial judge did not err in failing to charge the jury that it might find defendant John guilty of voluntary manslaughter. The evidence presented by the state tended to show that he was guilty of murder or nothing. The evidence presented by defendant Carl tended to show that defendant John was not guilty of anything. The state's evidence tended to show no provocation of defendants by Gordon. Defendant Carl's evidence tended to show that he was provoked into stabbing Gordon but that defendant John, although provoked, did not stab Gordon.

The question of excessive force arises solely on the testimony of defendant Carl and he testified that defendant John did not use any force except to push Gordon away from him. There was no evidence to require submission of voluntary manslaughter as to defendant John.

### DEFENDANT CARL GADSDEN'S APPEAL

[2] By his only assignment of error, defendant Carl contends the trial court erred to his prejudice in that it gave conflicting instructions to the jury. The assignment has no merit.

In explaining the law with respect to acting in concert, the court instructed the jury as follows:

So that, if you further find beyond a reasonable doubt that one or more stab wounds inflicted by either, proximately caused the death of Jerome Gordon, each would be equally responsible for the killing. (Underlining added.)

Defendant Carl argues that since voluntary manslaughter was not submitted as an alternative verdict for his brother, the quoted instruction conflicted with the instructions relating to voluntary manslaughter as to him and that he was prejudiced by the conflict.

The jury charge must be construed as a whole in the same connected way in which it was given; and "a disconnected portion may not be detached from the context of the charge and then critically examined for an interpretation from which erroneous expressions may be inferred." *State v. Bailey*, 280 N.C. 264, 185 S.E. 2d 683, *cert. denied.* 409 U.S. 948 (1972), and cases therein cited.

The quoted instruction was given very early in the charge when the court was instructing on second-degree murder. Much later in the charge the court gave clear instructions on voluntary manslaughter as related to defendant Carl, some of those instructions being set out above in discussing defendant John's appeal. In its final mandate the court again instructed clearly on what the jury would have to find in order to return a verdict of guilty of second-degree murder or voluntary manslaughter against defendant Carl.

We hold that the charge, when considered as a whole, was free from prejudicial error.

As to defendant John Gadsden—no error.

As to defendant Carl Gadsden—no error.

Justice BROCK did not participate in the consideration or decision of this case.