STATE OF NORTH CAROLINA v. LARRY DALE SHOEMAKER

No. 422A92

(Filed 30 July 1993)

**1. Evidence and Witnesses § 2089 (NCI4th)— demeanor of defendant—opinion evidence**

Testimony by various witnesses that defendant appeared "carefree," "extremely calm," "nonchalant," "very unconcerned," and "uncaring" on the night of a shooting was admissible opinion evidence based on the witnesses' observations of defendant's demeanor.

**Am Jur 2d, Expert and Opinion Evidence §§ 359-361, 364.**

STATE v. SHOEMAKER

[334 N.C. 252 (1993)]

2. **Evidence and Witnesses § 2803 (NCI4th) — demeanor of defendant — questions not leading**

Questions asking witnesses about defendant's emotional state or demeanor on the night of a shooting were not leading because they did not suggest a desired response. Furthermore, assuming *arguendo* that these questions were leading, it was within the discretion of the trial court to allow these questions on direct examination.

Am Jur 2d, Witnesses §§ 429-431, 509, 510.

3. **Evidence and Witnesses § 165 (NCI4th) — note written by murder victim — victim's state of mind — premeditation and deliberation — probative value not outweighed by prejudice**

The trial court in a first-degree murder prosecution did not err by denying defendant's motion to suppress a note written by the victim on the date of her death on the ground that its probative value was substantially outweighed by the danger of unfair prejudice to defendant where the note was evidence of the victim's state of mind in that it indicated that the victim was scared of defendant because he had threatened to kill her with a gun earlier that evening, and the note could be used by the jury to consider whether the victim provoked defendant in determining whether defendant's acts were premeditated and deliberate.

Am Jur 2d, Evidence § 360.

4. **Evidence and Witnesses § 3106 (NCI4th) — corroboration — addition of specific details**

An SBI agent's testimony was properly admitted for the purpose of corroborating defendant's ex-wife's earlier testimony about a gun owned by defendant where the ex-wife had already identified defendant's gun in court and stated that she had talked with a law officer about the gun on the telephone; the SBI agent's testimony adds specific details to her description of defendant's gun; and the SBI agent's testimony thus adds both weight and credibility to the ex-wife's testimony.

Am Jur 2d, Witnesses §§ 632 et seq.

5. **Evidence and Witnesses § 2265 (NCI4th) — expert testimony — unlikely wounds self-inflicted**

The trial court in a first-degree murder case did not err by admitting a forensic pathologist's opinion that it was highly

STATE v. SHOEMAKER

[334 N.C. 252 (1993)]

unlikely that the victim's wound was self-inflicted where the opinion was based on findings from his autopsy of the victim concerning the location of the wound, the distance from which the shot was fired, and the awkward angle that the victim would have had to hold the gun to inflict such a wound.

**Am Jur 2d, Expert and Opinion Evidence § 263.**

**Admissibility, in homicide prosecution, of opinion evidence that death was or was not self-inflicted. 56 ALR2d 1447.**

6. **Evidence and Witnesses § 876 (NCI4th)— victim's statement of intent—state of mind exception to hearsay rule**

Testimony that a murder victim told a friend approximately a week before she was killed that she intended to end her relationship with defendant when he returned from a trip was admissible under N.C.G.S. § 8C-1, Rule 803(3) as evidence of the victim's mental or emotional condition at the time she made the statement. A period of approximately a week between the time of the statement and the victim's death is not so great as to render the statement irrelevant.

**Am Jur 2d, Evidence §§ 497 et seq.**

7. **Homicide § 250 (NCI4th) — first-degree murder—premeditation and deliberation—sufficiency of evidence**

The evidence was sufficient to take the issue of premeditation and deliberation to the jury in a first-degree murder prosecution where it tended to show that there was a lack of provocation on the part of the victim; a note written by the victim on the date of her death indicated that defendant had pulled a gun on her and threatened her life; after the killing, defendant appeared "carefree," "extremely calm," "nonchalant," "very unconcerned," and "uncaring" to officers and medical personnel and defendant never inquired as to the health or status of the victim; and the killing was done in a brutal manner in that the victim was shot in the face from a distance of two to six inches.

**Am Jur 2d, Homicide §§ 437 et seq.**

8. **Homicide § 226 (NCI4th) — first-degree murder—defendant as perpetrator—sufficiency of evidence**

There was sufficient circumstantial evidence for the jury to find that defendant was the perpetrator of a first-degree

murder where the evidence tended to show that defendant was the only person in the house with the victim when the police arrived; the .22-caliber bullet removed from the victim had the same rifling characteristics and similar barrel markings as a bullet taken from a box of ammunition found in defendant's truck and fired from defendant's gun; the nine-shot .22-caliber pistol found on the floor of the master bedroom had eight live rounds and one fired cartridge in the cylinder; defendant's ex-wife identified the pistol found in the bedroom as belonging to defendant; a pathologist testified that it was highly unlikely that the victim's gunshot wound was self-inflicted; the victim left a handwritten note explaining that defendant had pulled a gun on her earlier in the evening and had threatened to kill them both; defendant first told officers on the scene that he did not know what happened but later told a detective that he heard a gunshot while watching television, found the victim's body, and caught a glimpse of a figure running up the hill; defendant later told the detective that he pled "no contest"; and defendant claimed that he had no knowledge about the gun that was found, but when asked how the gun could have gotten into the master bedroom without his noticing it, admitted that he moved it.

**Am Jur 2d, Homicide § 435.**

9. **Homicide §§ 558, 706 (NCI4th) — first-degree murder — refusal to instruct on voluntary manslaughter**

The trial court in a first-degree murder prosecution did not err in denying defendant's request for an instruction on the lesser included offense of voluntary manslaughter where there was no evidence of defendant being under the influence of passion or in the heat of blood produced by adequate provocation. Assuming *arguendo* that there was some evidence to support an instruction on voluntary manslaughter, the trial court's failure to so instruct was harmless error where the court instructed on first-degree and second-degree murder and the jury returned a verdict of guilty of first-degree murder.

**Am Jur 2d, Homicide §§ 525 et seq.**

10. **Homicide § 658 (NCI4th) — first-degree murder — voluntary intoxication — instruction not required**

The trial court in a first-degree murder prosecution did not err by failing to instruct the jury on voluntary intoxication

because the evidence would not support a reasonable finding that defendant was "utterly incapable" of forming a premeditated and deliberated intent to kill where the only evidence of defendant's use of alcohol was one detective's testimony that he smelled alcohol on defendant and defendant's statement to that detective that he had consumed at least six beers since 2:30 the day of the killing and did not have supper that evening; when the detective was asked on cross-examination if defendant appeared to have had too much to drink, the detective replied, "Not really," and upon further questioning stated that although he felt that defendant was "under the influence," defendant "was not drunk, or sloppy drunk"; defendant engaged in a lengthy conversation with the detective and provided the detective with his full name, date of birth, driver's license number, address, telephone number, and information regarding his employer; there is nothing in the record to indicate that any of the other officers at the scene felt that defendant was under the influence of alcohol; and it was defendant who called the emergency dispatchers to report that the victim was shot.

**Am Jur 2d, Homicide § 517.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a life sentence entered by Rousseau, J., at the 1 June 1992 Criminal Session of Superior Court, Wilkes County. Heard in the Supreme Court 13 May 1993.

*Michael F. Easley, Attorney General, by Michael S. Fox, Associate Attorney General, for the State.*

*Frye, Kasper & Booth, by Leslie G. Frye and Granice Geyer-Smith, for defendant-appellant.*

MEYER, Justice.

On 3 February 1992, defendant, Larry Dale Shoemaker, was indicted for the first-degree murder of Jane Elizabeth Copeland. Defendant was tried noncapitally in the Superior Court, Wilkes County, in June 1992 and was found guilty. The trial court thereafter imposed the mandatory life sentence.

The evidence presented by the State at trial tended to show the following facts and circumstances. On 21 August 1991, shortly

after 11:00 p.m., the Wilkes County Sheriff's Department received a call from defendant, notifying them that there had been a shooting. Lieutenant Jeff Hemric responded to the call and discovered the body of the victim lying in the doorway of her residence. Defendant was in the next room talking to the Wilkes County Communications Center on the telephone.

Dane Mastin, the Sheriff of Wilkes County, arrived at the victim's home shortly after Lieutenant Hemric. In the master bedroom, the sheriff found a .22-caliber handgun lying on the floor next to a gym bag. Near another bedroom, the sheriff found a packed Pierre Cardin travel bag with a handwritten note just inside the bag. The note read as follows:

8/21/91

> If I should die of a violent death, please see that Larry Dale Shoemaker gets psychiatric help. This night he has pulled a gun out in my home & said he would end it for both of us! I got him to put the gun in his truck & tried to talk to him — he said he loved me & I wouldn't leave him. I told him I didn't want to leave him & I loved him but why did he want to scare me!

Jane Copeland

Chris Shew, a detective for the Wilkes County Sheriff's Department, participated in the investigation of the crime scene that evening. He began talking with defendant, and when he asked defendant what happened, defendant responded, "No comment." After talking to some of the other officers, Detective Shew again talked with defendant, and defendant described the incident to him. Defendant stated that he began drinking about 2:30 p.m. that afternoon and that he had at least six beers. Defendant told Detective Shew that he had arrived at the victim's residence at approximately 5:30 p.m. and that the victim had arrived home at approximately 6:00 p.m. Defendant, who was a truck driver, stated that he had been living there with the victim since 1990 when he was in town between trips. He further stated that he had watched television and had not eaten supper. He stated that neither he nor the victim left the house nor did they have any company that evening. Defendant stated that he was sitting in a recliner in the living room when he saw the victim walk by, and about two minutes later he heard a shot. Defendant stated

that after he heard the shot, he ran to the room, where he found the victim lying in front of the door. He stated that he moved her back, went out the door, and caught a glimpse of someone running up the hill. Defendant stated that he called the emergency operator at least twice and perhaps a third time. Detective Shew asked defendant about the gun that was found in the bedroom. Defendant stated that he did not know where it came from or how it got there and that he had never seen it before. Detective Shew took defendant into the room where the gun was found and let him see it on the floor; defendant again claimed that he had never seen it before. Detective Shew told defendant that he assumed the gun was the murder weapon but that he could not figure out how the gun could have gotten from the victim's body to the bedroom without defendant having seen someone put it there. Defendant stated that he did not know how the gun got there and then changed his story, saying that he moved the gun. When asked why he moved the gun, defendant stated that he did not know.

Detective Shew testified that during the interview, defendant became belligerent and told him to "cut the bullshit." When Detective Shew asked defendant what he meant, defendant again stated, "You know what I mean. . . . Cut the bullshit. I plead no contest." When asked a second time what he meant, defendant stated again, "I just plead no contest."

Agent Eugene Bishop testified that he received and examined the gun found at the victim's house and found that it was a .22-caliber revolver that held nine rounds. When he opened the cylinder, he discovered eight live rounds and one fired cartridge case. Agent Steve Cabe testified that a box of .22-caliber ammunition was taken from defendant's pickup truck. Agent Bishop testified that the cartridges found in defendant's truck were the same caliber and type as the rounds found in the gun.

Charles McClelland, Jr., a special agent with the State Bureau of Investigation, testified that he received the test kit containing the hand-wiping samples taken from defendant and performed the gunshot residue analysis. Agent McClelland testified that the results were not significant enough to indicate whether defendant had fired the weapon that evening. Agent McClelland further testified that he examined the gunshot residue kit taken from the victim

and that nothing was present in significant concentrations to indicate that the victim had fired the gun.

Pamela Cox, defendant's ex-wife, identified State's exhibit #21, the .22-caliber pistol found at the victim's residence, as being defendant's gun. She testified that defendant had owned it before they were married.

Several officers and agents who were at the scene the night of the shooting testified that defendant appeared "extremely calm" and "nonchalant."

Dr. Patrick Lantz, assistant professor of pathology at Bowman Gray School of Medicine, testified as an expert in forensic pathology. He performed the autopsy on the victim on 22 August 1991. Dr. Lantz testified that the victim had an intermediate range, small-caliber gunshot wound to the head. The entrance was located just to the right of the midline of the chin, below the lip. Dr. Lantz further testified that, in his opinion, it was highly unlikely that the victim's wound was self-inflicted. He based his opinion on the evidence concerning the location of the wound, the distance from which the gun was fired, and the type of wounds that are normally encountered when wounds are self-inflicted.

Additional facts will be discussed as necessary for the proper disposition of the issues raised by defendant.

[1] Defendant first argues that the trial court erred in admitting the testimony of several law enforcement officers regarding defendant's state of mind, emotional state, and demeanor on the night of the shooting. Defendant contends that the testimony was elicited by leading or suggestive questions and that the testimony was unresponsive to questions asked. We disagree.

Several law enforcement officers and medical personnel who investigated the scene of the shooting testified for the State in this case. Each was asked whether he saw defendant the night of the shooting, and each was asked to describe either defendant's emotional state or defendant's demeanor. The various witnesses described defendant as being "carefree," "extremely calm," "nonchalant," "very unconcerned," and "uncaring."

"Opinion evidence as to the demeanor of a criminal defendant is admissible into evidence." *State v. Stager*, 329 N.C. 278, 321,

406 S.E.2d 876, 900 (1991). This Court in *Stager* restated the rule as follows:

> "The instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, matters of fact, and are admissible in evidence.

> "A witness may say that a man appeared intoxicated or angry or pleased. In one sense the statement is a conclusion or opinion of the witness, but in a legal sense, and within the meaning of the phrase, 'matter of fact,' as used in the law of evidence, it is not opinion, but is one of the class of things above mentioned, which are better regarded as matters of fact. The appearance of a man, his actions, his expression, his conversation—a series of things—go to make up the mental picture in the mind of the witness which leads to a knowledge which is as certain, and as much a matter of fact, as if he testified, from evidence presented to his eyes, to the color of a person's hair, or any other physical fact of like nature."

*State v. Leak*, 156 N.C. 643, 647, 72 S.E. 567, 568 (1911) (quoting J. McKelvey, Handbook of the Law of Evidence § 132 (rev. 2d ed. 1907)).

*State v. Stager*, 329 N.C. at 321, 406 S.E.2d at 901. This Court held in *Stager* that the testimony that defendant was calm and not crying described defendant's emotional state shortly after her husband was killed and was based upon the witnesses' observations of her demeanor at that time. The Court reasoned that such evidence tends to shed light upon the circumstances surrounding the killing and is relevant and admissible. In the case *sub judice*, the witnesses testified that defendant appeared "carefree," "extremely calm," "nonchalant," "very unconcerned," and "uncaring." Based on the foregoing reasoning in *Stager*, this testimony was properly admitted by the trial court.

[2] Defendant further contends that the questions about defendant's emotional state and demeanor were leading. Defendant argues that by asking each witness about defendant's emotional state, rather than asking if the witness made any observations or noticed

anything about defendant's appearance, the prosecutor was leading the witness. We disagree.

Each witness was asked if he observed defendant on the night in question, and each was asked about defendant's emotional state or his demeanor. "A leading question is generally defined as one which suggests the desired response and may frequently be answered yes or no." *State v. Riddick*, 315 N.C. 749, 755, 340 S.E.2d 55, 59 (1986). Asking a witness, "[W]hat was his [defendant's] emotional state at the time?" or "What, if anything, did you notice about his emotional state at that time?" does not suggest a desired response. Furthermore, it is within the trial judge's discretion to allow leading questions on direct examination, and the trial judge may be reversed for abuse of discretion only upon a showing that his ruling was manifestly unsupported by reason and could not have been the result of a reasoned decision. *Id.* at 756, 340 S.E.2d at 59. Even assuming *arguendo* that these questions were leading, we find no abuse of discretion by the trial court in allowing these questions to be asked and answered. This assignment of error is overruled.

[3] In his next assignment of error, defendant contends that the trial court erred in denying defendant's motion to suppress a note written by the deceased on the date of her death on the grounds that it is hearsay and that its probative value is substantially outweighed by the danger of unfair prejudice to defendant. Defendant's argument is without merit. Although defendant claims in his assignment of error that the note is hearsay, defendant does not argue in the text of his brief that the note is hearsay, and thus any contention that the note constitutes hearsay is deemed waived. Defendant's argument addresses only his contention that the note is extremely prejudicial to him, outweighing any probative value to the State. We disagree.

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rule 403 (1992). "Whether to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court." *Stager*, 329 N.C. at 308, 406 S.E.2d at 897. The trial court will not be reversed for abuse of discretion unless the trial court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision. *Id.*

Rule 403 calls for a balancing of the proffered evidence's probative value against its prejudicial effect. Necessarily, evidence which is probative in the State's case will have a prejudicial effect on the defendant; the question, then, is one of degree. The relevant evidence is properly admissible under Rule 402 *unless* the judge determines that it must be excluded, for instance, because of the risk of *"unfair* prejudice." *See* N.C.G.S. § 8C-1, Rule 403 (Commentary) (" 'Unfair prejudice' within its context [Rule 403] means an *undue* tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." (Emphasis added.))

*State v. Mercer,* 317 N.C. 87, 93-94, 343 S.E.2d 885, 889 (1986).

The prejudicial effect of the note in this case does not outweigh its probative value. The note is evidence of the victim's state of mind. The note indicates that the victim was scared of defendant because he had threatened to kill her with a gun earlier that evening. Additionally, this evidence could be used by the jury to consider whether the victim provoked defendant in determining whether defendant's acts were premeditated and deliberated. *See State v. Faucette,* 326 N.C. 676, 392 S.E.2d 71 (1990) (evidence of victim's state of mind relevant where jury could infer from such evidence that it was unlikely the victim would do anything to provoke defendant and the probative value outweighed any prejudicial effect). We find no error in the trial judge's discretionary ruling allowing the introduction of the note into evidence.

[4] Next, defendant contends that the trial court erred in admitting the testimony of SBI Agent Jeff Sellers as to a conversation he had with Pamela Cox, defendant's ex-wife. Defendant argues that Agent Sellers' testimony did not corroborate the trial testimony previously offered by Pamela Cox and is therefore hearsay. We disagree.

Pamela Cox testified at defendant's trial on direct examination in part as follows:

Q. Well, let me just ask you to look at State's Exhibit Number 21, ma'am, and if you would, look at that and tell us whether or not you recognize that gun?

A. I believe I do.

Q. And, what is, how do you recognize that gun, ma'am?

A. As being Larry's gun, Larry Shoemaker's gun.

Q. Do you know what sort of gun it is, what caliber it is?

A. It's a .22.

Q. And, did he have that the last time, as far as you know, the last time you saw him on January 3rd, of '91?

A. Yes, sir, as far as I know.

Q. All right. And, over, do you know how long he had owned that gun?

A. Not really. I think he had it before we were married. . . .

. . . .

Q. Go ahead, ma'am.

A. I was aware of the gun, I was most aware of the gun after we were married in 1970.

Q. All right. And, did you talk to an SBI agent in regard to this matter, Ms. Cox?

A. Yes, sir.

Q. Did you seek him out or did he seek you out?

A. I believe he sought me.

Q. Did he, this particular agent, was it . . . actually, you talked to two agents, did you not?

A. I believe so.

Q. And, one was over the phone, Agent Sellers, do you recall that?

A. I, I remember, over the phone. I probably wrote the name down, and I don't remember it now.

The State later offered the testimony of Agent Sellers, who spoke with Pamela Cox during the investigation to corroborate Ms. Cox's testimony. Agent Sellers testified as follows:

A. And, then she asked me, "Was it the .22 pistol?" And, I replied, "Yes, it was a .22 pistol."

. . . .

Q. All right, did you ask her to describe that .22 pistol to you?

A. Yes, I did. She stated. . . .

. . . .

Q. And, how did she describe it?

A. She described the weapon as a western type revolver, with a 4-inch barrel. She also stated that it appeared to have light wooden handles on it, which she described as pecan wood. She stated that she could not be sure, but she thought that the weapon had some gold on it somewhere.

"A prior statement by a witness is corroborative if it tends to add weight or credibility to his or her trial testimony. In addition, new information contained in a witness's prior statement but not referred to in his or her trial testimony may be admitted as corroborative evidence if it tends to add weight or credibility to that testimony." *State v. Coffey*, 326 N.C. 268, 293, 389 S.E.2d 48, 63 (1990) (citation omitted). In her testimony, Pamela Cox had already identified defendant's gun in court and stated that she had talked to a law enforcement agent about the gun on the telephone. Agent Sellers' testimony corroborates Pamela Cox's testimony by adding specific details to her description of defendant's gun. Therefore, Agent Sellers' testimony adds both weight and credibility to Pamela Cox's testimony.

Additionally, the trial court gave the following limiting instruction to the jury. "All right, members of the jury, you can consider what this officer said Ms. Cox told him to corroborate what she's testified about here on the stand. If it doesn't agree with it, or . . . [lend] support to it, disregard it." Agent Sellers' testimony was properly admitted for the purpose of corroborating defendant's ex-wife's earlier testimony. This assignment of error is overruled.

[5] In his next assignment of error, defendant contends that it was prejudicial error to admit the opinion of Dr. Lantz that it was highly unlikely that the victim's wounds were self-inflicted on the grounds that his opinion was incompetent and not based on medical data. This argument is without merit.

Rule 702 of the North Carolina Rules of Evidence sets forth the guidelines for testimony by experts, stating: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

training, or education[ ] may testify thereto in the form of an opinion." N.C.G.S. § 8C-1, Rule 702 (1992). This Court, in a pre-Rules case, has previously held:

> Admissibility of expert medical opinion is no longer strictly viewed through the narrow focus provided by the technical and vague concepts of invasion of the jury's province and the answer of an ultimate issue; rather, admissibility is evaluated primarily according to whether or not "the witness because of his expertise is in a better position to have an opinion on the subject than is the trier of fact." *State v. Wilkerson*, 295 N.C. 559, 568-69, 247 S.E.2d 905, 911 (1978).

*State v. Hunt*, 305 N.C. 238, 245, 287 S.E.2d 818, 822-23 (1982).

In this case, Dr. Lantz was qualified without objection as an expert in forensic pathology. Dr. Lantz performed the autopsy on the victim and testified that his autopsy revealed a gunshot wound to the right chin of the victim. The autopsy also revealed some unburned gunshot residue and powder embedded in the skin around the wound. This information along with knowledge of the caliber of the gun that inflicted the wound allowed Dr. Lantz to formulate an opinion that the muzzle of the gun was two to six inches from the skin surface when it was discharged. Dr. Lantz further testified that, in his opinion, it would be highly unlikely that the victim's wound was self-inflicted. His opinion was based on the location of the wound, the distance from which the shot was fired, and the awkward angle that the victim would have had to hold the gun to inflict such a wound. Dr. Lantz further testified that self-inflicted wounds typically occur on a number of other locations on the head or body rather than the chin, such as "around the ear, the temple, behind the ear, sometimes in the mouth, under the chin, on the chest, or the abdomen."

This Court has previously held similar evidence to be admissible. In *State v. Hunt*, this Court approved the admission of a doctor's testimony regarding whether a victim's wound was self-inflicted. In *Hunt*, we said:

> Applying similar standards of admission, a majority of jurisdictions have held that "the subject of self-inflicted wounds is not one of such common experience that laymen may not be assisted by the opinion of a doctor, who has special knowledge regarding anatomy and injuries to the human body." *State*

*v. Campbell*, 146 Mont. 251, 258, 405 P.2d 978, 983 (1965); *see* Annot., 56 A.L.R.2d 1447 (1957). We perceive no *current or defensible* obstacle in our case law to the adoption of that position in North Carolina.

*Hunt*, 305 N.C. at 245-46, 287 S.E.2d at 823.

Defendant argues that Dr. Lantz's testimony is mere conjecture and is unsupported by medical data. We disagree. Dr. Lantz's opinion is based on his findings from the autopsy of the victim. The trial court did not err in allowing Dr. Lantz to state his opinion that it was highly unlikely that the victim's wound was self-inflicted. This assignment of error is without merit.

[6] Next, defendant contends that the trial court erred in admitting into evidence a statement by the victim that she intended to end her relationship with defendant. Sherry Wood, a friend of the victim's, testified that about a week before the killing, the victim told her that defendant was on a trip but that when he returned she (the victim) intended to break up with him. Defendant argues that the statement should not have been admitted because it does not come within the hearsay exceptions allowed by N.C.G.S. § 8C-1, Rule 803(3) and is also irrelevant because the statement was made a week before the victim was killed. We disagree.

Rule 803(3) of the North Carolina Rules of Evidence provides that the following is not excluded by the hearsay rule, even though the declarant is not available as a witness:

(3) Then Existing Mental, Emotional, or Physical Condition.— A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

N.C.G.S. § 8C-1, Rule 803(3) (1992). "Rule 803(3) of the North Carolina Rules of Evidence permits admission of a witness's testimony as to statements of intent by another person to prove subsequent conduct by that other person." *State v. Coffey*, 326 N.C. 268, 285, 389 S.E.2d 48, 58 (1990) (trial court properly admitted testimony from two witnesses that the victim said she planned to go fishing with a nice gray-haired man). In the case *sub judice*, the victim

STATE v. SHOEMAKER

[334 N.C. 252 (1993)]

indicated an intent to end her relationship with defendant. Sherry Wood's testimony as to the victim's statement was admissible under Rule 803(3) as evidence of the victim's mental or emotional condition at the time she made the statements.

Defendant argues that the statement is not relevant and should have been excluded because it was "remote as to period of time." We disagree. Sherry Wood testified that she believed the statement was made approximately a week before the victim died but did not remember exactly. A period of approximately one week between the time of the statement and the victim's death is not so great as to render the statement irrelevant. *See State v. Cummings*, 326 N.C. 298, 312, 389 S.E.2d 66, 74 (1990) (trial court properly admitted a statement from the victim under Rule 803(3) that was made to a paralegal approximately three weeks before the victim's murder). This assignment of error is overruled.

[7] Defendant's next contention is that the trial court erroneously denied his motion to dismiss. Defendant contends that there was insufficient evidence of malice and premeditation and deliberation to submit this case to the jury. We disagree.

The law with regard to motions to dismiss in criminal trials is well settled. In *State v. Vause*, 328 N.C. 231, 400 S.E.2d 57 (1991), this Court stated the law as follows:

> When a defendant moves for dismissal, the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. Whether evidence presented constitutes substantial evidence is a question of law for the court. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The term "substantial evidence" simply means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

*Id.* at 236, 400 S.E.2d at 61 (citation omitted). In reviewing challenges to the sufficiency of the evidence, the evidence is viewed in the light most favorable to the State, and the State receives the benefit of all reasonable inferences. *State v. Williamson*, 333 N.C. 128, 423 S.E.2d 766 (1992). Contradictions and discrepancies are for the

jury to resolve. *Id.* The test for sufficiency of the evidence is the same whether the evidence is direct, or circumstantial, or both. *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984).

Defendant was convicted of first-degree murder. First-degree murder is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Misenheimer*, 304 N.C. 108, 282 S.E.2d 791 (1981). The intentional use of a deadly weapon gives rise to a presumption that the killing was unlawful and that it was done with malice. *State v. Judge*, 308 N.C. 658, 303 S.E.2d 817 (1983). Premeditation is defined as a killing that was thought out beforehand for some length of time, however short, but no particular length of time is necessary. *State v. Small*, 328 N.C. 175, 400 S.E.2d 413 (1991). "Deliberation is defined as an intent to kill executed by defendant in a cool state of blood or in the absence of anger or emotion." *State v. Stone*, 323 N.C. 447, 451, 373 S.E.2d 430, 433 (1988). "Premeditation and deliberation must ordinarily be proved by circumstantial evidence." *Id.* Some of the circumstances from which an inference of premeditation and deliberation can be drawn are:

> (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992).

In applying the foregoing principles of law to the facts of this case, we find no error in the trial court's refusal to grant defendant's motion to dismiss. A review of the evidence in this case supports a reasonable conclusion that the homicide was committed with malice, premeditation, and deliberation and that defendant was the perpetrator of the crime.

The evidence shows that there was a lack of provocation on the part of the deceased. There was no physical evidence of provocation. The furniture and household items were not in disarray. The victim had some bruises on her right hand, on her right shin,

and on her left calf. Additionally, the victim had small hemorrhages on the inner eyelid and around the eye and hemorrhages on the epiglottis. The pathologist testified that these hemorrhages are indicative of pressure being applied to the neck. There is nothing in the record to indicate that defendant had any injuries.

Additionally, premeditation and deliberation may be inferred in this case from the conduct and statements of defendant before and after the killing. The best evidence of defendant's conduct before the killing is contained in the note left by the victim. The note is evidence that defendant pulled a gun on the victim and threatened her life. After the killing, defendant appeared "carefree," "extremely calm," "nonchalant," "very unconcerned," and "uncaring" to the officers and medical personnel at the scene. Additionally, the record shows that defendant never inquired as to the health or status of the victim.

The third applicable circumstance from which premeditation and deliberation can be inferred is the threats and declarations of the defendant before the occurrence giving rise to the death of the deceased. Again, the note left by the victim outlining defendant's threats to kill her is the best evidence of this circumstance. Additionally, the victim's note provides substantial evidence of the fourth applicable circumstance, which is ill will or previous difficulties between the parties. The record also indicates that the victim was planning to end her relationship with defendant.

The last circumstance that allows an inference of premeditation and deliberation in the present case is that the killing was done in a brutal manner. The evidence shows that the victim was shot in the face from a distance of two to six inches.

As set forth above, the evidence in this case, when considered in light of the circumstances set forth in *Olson*, is sufficient to take the issue of premeditation and deliberation to the jury.

[8] There was ample circumstantial evidence that defendant shot the victim. Defendant was the only person in the house with the victim when the police arrived. The .22-caliber bullet that was removed from the victim had the same rifling characteristics and similar barrel markings as a bullet taken from the box of ammunition found in defendant's truck and fired from defendant's pistol. The nine-shot, .22-caliber pistol that was found on the floor of the master bedroom had eight live rounds and one fired cartridge

in the cylinder. Defendant's ex-wife identified the pistol, which was found in the bedroom, as belonging to defendant. The pathologist testified that it was highly unlikely that the victim's gunshot wound would have been self-inflicted. Furthermore, the victim left a handwritten note explaining that defendant had pulled a gun on her earlier in the evening and had threatened to kill them both. Finally, defendant's statements to the police provide further evidence that he shot the victim. Defendant first told officers on the scene that he did not know what happened. Later, defendant told a detective that he heard a gunshot while watching television. Defendant explained that he found the victim's body and then caught a glimpse of a figure running up the hill. Later in the same interview, defendant told the detective to "[c]ut the bullshit. I plead no contest." Additionally, defendant claimed that he had no knowledge regarding the gun that was found. Later, when asked how the gun could have gotten into the master bedroom without his noticing it, defendant admitted to moving it. The combination of these circumstances, together with the other evidence presented at trial, represents evidence sufficiently substantial for a jury to draw the reasonable inference that defendant was the perpetrator of the crime. This assignment of error is overruled.

[9] In his next assignment of error, defendant contends that the trial court erred in denying defendant's request for an instruction to the jury on the lesser included offense of voluntary manslaughter. We disagree.

This Court has previously held:

Voluntary manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. "One who kills a human being while under the influence of passion or in the heat of blood produced by adequate provocation is guilty of manslaughter." State v. Wynn, 278 N.C. 513, 518, 180 S.E.2d 135, 139 (1971). If any evidence of heat of passion on sudden provocation exists, either in the State's evidence or that offered by the defendant, the trial court must submit the possible verdict of voluntary manslaughter to the jury. The determinative factor is the presence of such evidence.

State v. Tidwell, 323 N.C. 668, 673, 374 S.E.2d 577, 580 (1989) (citations omitted). "It is well settled that the trial court is not required to charge the jury upon the question of a defendant's guilt of lesser degrees of the crime charged in the indictment

STATE v. SHOEMAKER

[334 N.C. 252 (1993)]

when there is no evidence to sustain a verdict of defendant's guilt of such lesser degrees." *State v. Gadsden*, 300 N.C. 345, 350, 266 S.E.2d 665, 669 (1980).

In the case *sub judice*, there is no evidence to support a charge to the jury on voluntary manslaughter. Defendant did not present evidence in this case. The only evidence of defendant's version of the victim's death came through defendant's statements to law enforcement officers. Defendant initially told the officers that he did not know what happened. Later he told a detective that he heard a gunshot and caught a glimpse of a figure running away. Under either the State's or defendant's version of the events, there is no evidence of defendant being under the influence of passion or in the heat of blood produced by adequate provocation. Because the record is devoid of evidence to support a voluntary manslaughter instruction, the trial court did not err in refusing to give this instruction to the jury.

Even assuming *arguendo* that there was some evidence to support an instruction on voluntary manslaughter, the trial court's failure to give it would have been harmless error. In this case, the trial court submitted three possible verdicts to the jury: first-degree murder, second-degree murder, and not guilty. In *State v. Freeman*, 275 N.C. 662, 170 S.E.2d 461 (1969), the trial court instructed the jury on first- and second-degree murder, and the jury returned a verdict of guilty of murder in the first degree. The defendant claimed that the trial court's instructions on voluntary manslaughter were erroneous and that it was error for the trial court to refuse to instruct on involuntary manslaughter. This Court held that the trial court had not erred and stated:

> A verdict of murder in the first degree shows clearly that the jurors were not coerced, for they had the right to convict in the second degree. That they did not indicates their certainty of his guilt of the greater offense. The failure to instruct them that they could convict of manslaughter therefore could not have harmed the defendant.

*Id.* at 668, 170 S.E.2d at 465; *see also State v. Fowler*, 285 N.C. 90, 203 S.E.2d 803 (1974), *death sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1212 (1976). We find no prejudicial error.

[10] In his final assignment of error, defendant contends that the trial court erred in failing to instruct the jury on voluntary

STATE v. SHOEMAKER

[334 N.C. 252 (1993)]

intoxication. We disagree. A defendant is entitled to an instruction on voluntary intoxication if the trial judge concludes that there is evidence that would reasonably support a finding that the defendant was "utterly incapable" of forming a premeditated and deliberated intent to kill. *State v. McQueen*, 324 N.C. 118, 141, 377 S.E.2d 38, 51 (1989).

In the present case, the evidence would not support a reasonable finding that defendant was "utterly incapable" of forming a deliberated and premeditated purpose to kill. The only evidence of defendant's use of alcohol was one detective's testimony that he smelled alcohol on defendant and defendant's statement to that detective that he had consumed at least six beers since 2:30 p.m. that day and did not have supper that evening. However, when the detective was asked on cross-examination if defendant appeared to have had too much to drink, the detective replied, "Not really." Upon further questioning, the detective stated that although he did feel that defendant was "under the influence," he also stated that defendant "was not drunk, or sloppy drunk."

Other evidence which indicates that defendant was not "utterly incapable" of forming the necessary intent includes the fact that defendant engaged in a lengthy conversation with the above-mentioned detective and provided the detective with his full name, date of birth, driver's license number, address, telephone number, and information regarding his employer. In fact, there is nothing in the record to indicate that any of the other officers at the scene felt that defendant was under the influence of alcohol. Additionally, it was defendant who called the emergency dispatchers' to report that the victim was shot. We conclude that defendant has not met his burden in this case of showing that he was "utterly incapable" of forming the necessary intent and was therefore not entitled to an instruction on voluntary intoxication. This assignment of error is overruled.

Based upon the foregoing, we conclude that defendant received a fair trial, free of prejudicial error.

NO ERROR.