TYSON, Judge.
 

 Travion Smith ("Defendant") appeals from judgment entered following a jury's verdict finding him guilty of first-degree murder. We find no error.
 

 I.
 
 Background
 

 On the evening of 13 May 2013, the day following Mother's Day, Defendant, Ronald Anthony ("Anthony"), and Sarah Redden ("Redden") were together in the vicinity of North Hills shopping center in Raleigh. The trio had been walking around several neighborhoods in the area, breaking into unlocked cars and stealing GPS devices, headphones, cell phones, and other valuables. Eventually they arrived at the Allister Apartments complex. The Allister Apartments consisted of several unoccupied buildings that were under construction and one occupied building.
 

 Melissa Huggins-Jones ("Huggins-Jones") and her eight-year-old daughter lived in one of the second-floor apartments of the occupied building. Huggins-Jones had recently moved to Raleigh from Tennessee to start a new job as a branch manager at a bank and to be closer to her mother, who lived in Wilmington. The front entrance of Huggins-Jones' apartment was located at the top of a set of stairs and down a breezeway. The back of the apartment had a balcony with a sliding glass door. The apartment located directly below Huggins-Jones' was being used as a temporary leasing office by the owner.
 

 Huggins-Jones' air conditioning had not been working properly on 13 May and the previous weekend. Huggins-Jones had called the apartment building's maintenance worker several times to have the AC unit repaired. The night of 13 May, Huggins-Jones kept "the windows in the bedrooms" and the "sliding [glass] door to the balcony" "wide open" to try and keep the apartment cool. Huggins-Jones' daughter also had a large box fan operating in her bedroom.
 

 After breaking into several cars, Defendant, Anthony, and Redden went to one of the unoccupied buildings of the Allister Apartments to look through their back packs at the items they had stolen. While Redden was charging her cell phone, Defendant and Anthony told her "they were going to go
 
 *681
 
 check something, and told [her] to wait there." Redden testified that she could not see where Defendant and Anthony went.
 

 After waiting about ten minutes, Redden walked outside the unoccupied building to look around for Defendant and Anthony. Redden did not see Defendant and Anthony, so she went back inside the unoccupied apartment to continue charging her cell phone. After waiting five more minutes, Redden stepped outside the apartment and observed Defendant and Anthony walking from the direction of the occupied apartment building.
 

 Defendant and Anthony again told Redden to stay at the unoccupied building, and they walked back in the direction of the occupied building. After waiting another ten minutes, Redden walked over to the occupied apartment. While Redden was outside the occupied apartment, a police car drove by and she hid in the breezeway of the building under the stairwell. Redden waited a minute until after the police car had left the area. She left the stairwell and heard a noise "like a shuffle" that made her look up.
 

 Redden observed Defendant standing on the second-floor balcony of Huggins-Jones' apartment. Defendant was using his shirt to wipe off the balcony railing. Redden told Defendant they needed to leave and asked him where Anthony was. In response, Defendant indicated to the sliding glass door behind him.
 

 A few minutes later, Redden saw lights from a car and she hid under the stairwell again. Redden observed a police car drive up and stop in the driveway of the apartment building for a "minute or so" and then leave. About five minutes later, Redden left the stairwell and walked to the other side of the apartment building. As she arrived at the other side of the building, Anthony ran up to her. Anthony told her "to just go" and that he was going to find Defendant.
 

 Redden ran to a fence that was bordering the apartment complex and shortly thereafter observed Anthony and Defendant running towards her. Anthony was carrying water bottles and Defendant carrying two laptop computers. The three jumped the fence and ran along Six Forks Road to a parking lot at North Hills shopping center.
 

 In the parking lot, Redden observed Anthony and Defendant wash their hands off with water from one of the water bottles. Anthony then called and asked an acquaintance to pick them up. Anthony referred to this acquaintance as "Reese." Reese arrived and picked up Defendant, Anthony, and Redden, and drove them to a nightclub called "Flashbacks." Redden testified that during the car ride, Anthony showed Reese an iPhone in a "woman's colored case" and a bloody knife. Redden stated that Defendant was not surprised by Anthony displaying the bloody knife. Redden observed Defendant "looked [to have] specs (sic) of blood on his shirt."
 

 Upon arriving at the nightclub, Anthony and Reese went inside while Redden and Defendant waited outside. Redden asked Defendant, "What is going on?" Defendant told her "to let it go, don't ask questions, just forget about it."
 

 After leaving the nightclub, Defendant, Anthony, and Redden checked into a Super 8 Motel at approximately 3:25 a.m. At the motel, Redden observed Defendant remove the two laptop computers from his back pack. Defendant kept a silver one and gave the other orange-colored one to Anthony. Redden testified that Defendant asked Anthony, "What the hell just happened?" Defendant then said, "Man, I got a son." Redden described Defendant as "nervous about not seeing his son."
 

 Redden also testified that Defendant and Anthony had a conversation about "being happy that the little girl did not wake up." Huggins-Jones' daughter testified she kept a large, loud box fan in her bedroom to help her sleep and that she had it on that night. Huggins-Jones' daughter recalled "hear[ing] a screaming noise" that night, but went back to sleep because "[i]t didn't sound like it was in our apartment."
 

 Redden never observed what Defendant and Anthony did with the knife, iPhone, or clothes they had worn earlier in the evening.
 

 At approximately 7:00 a.m., Huggins-Jones' daughter discovered her mother's
 
 *682
 
 body. She went outside the apartment building and sought help from two construction employees working in the vicinity of the apartment complex. The two construction workers accompanied Huggins-Jones' daughter into the apartment unit and called 911. One of the construction workers observed Huggins-Jones dead upon the bed in her bedroom. He described her appearance in the bedroom: "I could tell she had blood all over her face and blood was everywhere, and I put three fingers on her wrist and there was no pulse, and she was cold as a block of ice[.]"
 

 Shortly thereafter, emergency personnel arrived at the scene and confirmed Huggins-Jones had died from unnatural causes. Dr. Lauren Scott of the North Carolina Office of the Chief Medical Examiner performed the autopsy of Huggins-Jones and verified she had suffered at least eighteen separate blows to her face, neck, and upper chest area consistent with both blunt and sharp force trauma, in addition to multiple bruises.
 

 Huggins-Jones injuries included, in part: a fractured skull, a broken jaw, a broken nose, a severed carotid artery, four dislodged teeth, "a chop wound" into her left shoulder, and puncture wounds in the left and right sides of her chest and shoulders. There were multiple bruises on her arms consistent with defensive wounds, in addition to several bruises on her face, back, and legs. Dr. Scott testified it took Huggins-Jones "anywhere from several minutes to an hour to die."
 

 First responders and police investigators testified to the state of disarray in Huggins-Jones' apartment. Various items had been overturned on her dresser, her nightstand door had been torn off, window blinds had been pulled off the wall, a purse had been emptied on the kitchen table, a drawer from a jewelry armoire had been pulled out and blood found on one of the jewelry boxes.
 

 Investigators discovered Huggins-Jones' blood on her bedroom doorknob, her daughter's bedroom doorknob, Huggins-Jones' purse, her wallet, two checkbooks, and a book cover in the hallway. A droplet of Huggins-Jones' blood was found on the apartment balcony, and a swabbing of the balcony railing tested positive for her blood.
 

 Police investigators also discovered that the leasing office in the apartment unit immediately below Huggins-Jones' unit had been robbed. Various items were in disarray in the office and two Lenovo laptop computers, one silver and the other orange, were missing along with a Canon digital camera, charger, and camera bag.
 

 Approximately a week later, on 20 May 2013, police found an orange Lenovo laptop bearing the same serial number as the one stolen from the leasing office beneath Huggins-Jones' apartment listed for sale on the Craigslist website. Detective Zeke Morse of the Raleigh Police Department posed as an interested buyer and contacted the seller of the laptop, Mike McCollum ("McCollum"), who lived in Wake Forest. Detective Morse offered to pay the listed price for the laptop and arranged to meet McCollum the afternoon of 20 May at a Wal-Mart store parking lot located in Wake Forest. McCollum became suspicious of the high offer price for the laptop. McCollum removed the listing for the orange laptop from Craigslist, did not appear at the agreed upon location, and did not return further calls from Detective Morse.
 

 Police began surveillance of McCollum's residence that same day and later obtained a warrant to search the residence on 21 May. During the execution of the search warrant, police discovered the stolen silver Lenovo laptop and arrested McCollum.
 

 McCollum cooperated with the police and explained to them how had he obtained the silver laptop. Anthony had called and asked him to sell two Lenovo laptops that Anthony "was trying to get rid of" but had told him "they weren't stolen." Anthony text messaged McCollum pictures of the orange laptop, which McCollum used to list the laptop on Craigslist. Anthony used his girlfriend's, Amber Alberts' ("Alberts"), cellphone to send the text messages to McCollum. On 20 May 2013, McCollum posted the listing for the orange laptop, but he did not yet have possession of either the orange or silver laptops.
 

 McCollum stated that on the morning of 21 May, he had received a phone call from Defendant. Defendant informed McCollum
 
 *683
 
 that he was at the Wal-Mart store in Wake Forest and had the silver laptop for McCollum to sell. McCollum sent his fiancée and her friend to pick up Defendant and bring him to McCollum's residence. Defendant provided McCollum with the silver laptop in exchange for McCollum giving him $50 up front. McCollum's girlfriend drove Defendant back to the Wal-Mart store in Wake Forest.
 

 Undercover police officers conducting surveillance of McCollum's residence observed a person, who was later determined to be Defendant, leave the residence. The officers followed McCollum's fiancée's car as she drove Defendant back to the Wal-Mart store. McCollum's fiancée dropped Defendant off at the Wal-Mart store. One of the officers, Detective Gory Mendez of the Raleigh Police Department, remained behind at the Wal-Mart store to determine Defendant's identity. The other undercover officers followed McCollum's fiancée back to McCollum's residence.
 

 Detective Mendez lost sight of Defendant for approximately thirty minutes, but eventually found him sitting inside a car with Anthony, Alberts, and another woman, in a parking lot near the Wal-Mart store. Detective Mendez observed the four individuals get out of the car and walk over to the Wal-Mart store. Detective Mendez made arrangements to have law enforcement officers with the Raleigh Police Department come pick up Defendant and Anthony and take them to the police station for questioning. During the time Detective Mendez was following Defendant, other officers were executing the search warrant for McCollum's residence.
 

 An officer requested Alberts to give him her phone for examination. The officer discovered pictures of the orange laptop on Alberts' phone and the text messages Anthony had sent McCollum. Law enforcement officers obtained a search warrant for Alberts' residence. The officers discovered a large bag that Alberts identified as Anthony's bag. Inside the bag were GPS devices, phone chargers, cords, and other items that were consistent with items reported stolen from cars in the neighborhood surrounding the Allister Apartments complex the night of 13 May 2013. When police took Defendant in for questioning, they requested he hand over his shoes, a pair of red and black Nike tennis shoes. A grand jury returned a true bill of indictment for the first-degree murder of Huggins-Jones against Defendant on 3 June 2013.
 

 Defendant's capital murder trial began on 4 January 2016. Prior to Defendant's trial, Anthony pled guilty to first-degree murder and received a sentence of life imprisonment without the possibility of parole. Defendant stipulated at trial to being "involved with the other co-defendants in breaking into cars and was with the co-defendants before and after the incident and was involved in selling stolen items afterwards;
 
 i.e.
 
 , the laptop."
 

 Melvin Brown ("Brown") was called as a witness by the State. At the time of trial, Brown was serving a sentence for trafficking heroin. Brown met Defendant at the Wake County Jail, while Defendant was awaiting trial. Brown testified Defendant told him the reason he was in jail was because of a laptop. Brown stated that Defendant told him:
 

 [T]hey had broken into a house, [Defendant] and another guy, and that is how he got the laptop. He took the laptop, like $200, some jewelry.
 

 He told me while he was in a place robbing the place, that the lady confronted him. She started yelling at him and he told me he jumped on the lady. He was hitting her and she was screaming and stuff. And then he said that his co-defendant had stabbed the lady with a knife, stabbed her in the temple and stabbed her in the chest.
 

 Defendant also told Brown that police did not have the knife, and that he was confident police would not find blood on the shoes he was wearing the night of the murder. Brown had provided the police and the prosecution with the information Defendant had allegedly communicated to him in exchange for a twenty-month reduction in his prison sentence and a waiver of the mandatory $100,000 fine for trafficking heroin. Brown testified about threats he had received from Defendant in response to his cooperation with the prosecution. Brown also recounted a jailhouse attack against him in retaliation for speaking with the prosecution about Defendant.
 

 *684
 
 Before the trial court charged the jury, Defendant requested a special instruction in writing regarding Brown's motivation for testifying. The trial court denied Defendant's requested special instruction.
 

 Defendant did not present any evidence during the guilt-innocence determination phase of the trial. The trial court submitted to the jury the charges of: (1) first-degree murder under the theory of premeditation and deliberation and the alternative theory of felony murder; and (2) second-degree murder. The trial court also instructed the jury on the criminal liability theory of acting in concert with regards to each of Defendant's charges.
 

 The jury found Defendant guilty of first-degree murder on the basis of premeditation and deliberation, as well as under the felony murder rule with burglary as the underlying felony. During the sentencing phase, the jury recommended a sentence of life imprisonment without the possibility of parole. The trial court entered judgment on 22 February 2016 and sentenced Defendant in accordance with the jury's recommendation. Defendant appeals.
 

 II.
 
 Jurisdiction
 

 Jurisdiction lies in this Court as of right from a final judgment in a superior court. N.C. Gen. Stat. § 7A-27(b)(1) (2017).
 

 III.
 
 Issues
 

 Defendant argues the trial court erred: (1) by not giving his requested special jury instruction regarding potential bias of the State's witness Brown; and, (2) by allowing Brown to testify about his belief that Defendant was involved in an attack upon Brown while they were in jail, over Defendant's objection.
 

 IV.
 
 Jury Instruction
 

 A.
 
 Standard of Review
 

 Defendant and the State disagree over which standard of review this Court should apply to the issue of the trial court's refusal of Defendant's requested instruction. Defendant asserts the standard of review is
 
 de novo
 
 and the State asserts this Court should review for an abuse of discretion. This Court has recognized "the proper standard of review depends upon the nature of a defendant's request for a jury instruction."
 
 State v. Edwards
 
 ,
 
 239 N.C. App. 391
 
 , 392,
 
 768 S.E.2d 619
 
 , 620 (2015).
 

 Defendant cites
 
 State v. Osorio
 
 ,
 
 196 N.C. App. 458
 
 , 466,
 
 675 S.E.2d 144
 
 , 149 (2009), to argue the proper standard of review is
 
 de novo
 
 . At issue in
 
 Osorio
 
 was whether sufficient evidence existed to support a jury instruction on acting in concert.
 
 Id
 
 ."Whether evidence is sufficient to warrant an instruction ... is a question of law[.]"
 
 State v. Cruz
 
 ,
 
 203 N.C. App. 230
 
 , 242,
 
 691 S.E.2d 47
 
 , 54 (2010). This Court reviews questions of law
 
 de novo
 
 .
 
 Edwards
 
 ,
 
 239 N.C. App. at 393
 
 ,
 
 768 S.E.2d at 621
 
 (citations omitted).
 

 Where the issue is not a question of law reviewed
 
 de novo
 
 , the appropriate standard of review is for an abuse of discretion.
 
 State v. Lewis
 
 ,
 
 346 N.C. 141
 
 , 145,
 
 484 S.E.2d 379
 
 , 381 (1997) ("[w]hether the trial court instructs using the exact language requested by counsel is a matter within its discretion and will not be overturned absent a showing of abuse of discretion.") (quoting
 
 State v. Herring
 
 ,
 
 322 N.C. 733
 
 , 742,
 
 370 S.E.2d 363
 
 , 369 (1988) );
 
 State v. Shepherd
 
 ,
 
 156 N.C. App. 603
 
 , 607,
 
 577 S.E.2d 341
 
 , 344 (2003) ("the choice of instructions given to a jury 'is a matter within the trial court's discretion and will not be overturned absent a showing of abuse of discretion.' ") (quoting
 
 State v. Nicholson
 
 ,
 
 355 N.C. 1
 
 , 66,
 
 558 S.E.2d 109
 
 , 152,
 
 cert. denied
 
 ,
 
 537 U.S. 845
 
 ,
 
 123 S.Ct. 178
 
 ,
 
 154 L.Ed.2d 71
 
 (2002) ).
 

 The issue before us involves the trial judge's choice of language in the instructions given to the jury. We review the trial court's ruling for an abuse of discretion.
 
 See
 

 Lewis
 
 ,
 
 346 N.C. at 145
 
 ,
 
 484 S.E.2d at 381
 
 .
 

 "A trial court must give a requested instruction that is a correct statement of the law and is supported by the evidence."
 
 State v. Conner
 
 ,
 
 345 N.C. 319
 
 , 328,
 
 480 S.E.2d 626
 
 , 629 (citation omitted),
 
 cert. denied
 
 ,
 
 522 U.S. 876
 
 ,
 
 118 S.Ct. 196
 
 ,
 
 139 L.Ed.2d 134
 
 (1997). However, the trial court "need not give the requested instruction verbatim."
 
 Id
 
 . Instead, "an instruction that gives
 
 *685
 
 the substance of the requested instructions is sufficient."
 
 Id
 
 . To show that the refusal to give an instruction was error, the defendant "must show that the requested instructions were not given in substance and that substantial evidence supported the omitted instructions."
 
 State v. Beck
 
 ,
 
 233 N.C. App. 168
 
 , 171,
 
 756 S.E.2d 80
 
 , 82 (2014) (citation omitted).
 

 "[W]hen instructions, viewed in their entirety, present the law fairly and accurately to the jury, the instructions will be upheld."
 
 State v. Roache
 
 ,
 
 358 N.C. 243
 
 , 304,
 
 595 S.E.2d 381
 
 , 420 (2004). "[I]t is not enough for the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury."
 
 State v. Cornell
 
 ,
 
 222 N.C. App. 184
 
 , 191,
 
 729 S.E.2d 703
 
 , 708 (2012) (citations and brackets omitted).
 

 "In order for a new trial to be granted, the burden is on the defendant to not only show error but to also show that the error was so prejudicial that without the error it is likely that a different result would have been reached."
 
 State v. Owen
 
 ,
 
 133 N.C. App. 543
 
 , 549,
 
 516 S.E.2d 159
 
 , 164 (1999) (citation omitted).
 

 B.
 
 Special Instruction
 

 Defendant requested the following special jury instruction regarding Brown's testimony:
 

 There is evidence which tends to show that a witness testified with the hope that their testimony would convince the prosecutor to recommend a charge reduction. If you find that the witness testified for this reason, in whole or in part, you should examine this testimony with great care and caution. If, after doing so, you believe the testimony, in whole or in part, you should treat what you believe the same as any other believable evidence.
 

 The trial court denied the requested special instruction, and gave the jury the pattern jury instructions on interested witnesses and informants, as follows:
 

 You may find that a witness is interested in the outcome of this case. You may take the witness's interest into account in deciding whether to believe the witness. If you believe the testimony of the witness in whole or in part, you should treat what you believe the same as any other believable evidence. [N.C.P.I.-Crim. 104.20 (2011) ]
 

 ...
 

 You may find that a State's witness is interested in the outcome of this case because of the witness's activity
 
 as an informer
 
 . If so, you should examine the testimony of the witness with care and caution. After doing so, if you believe the testimony in whole or in part, you should treat what you believe the same as any other believable evidence. (Emphasis supplied). [N.C.P.I.-Crim. 104.30 (2011) ]
 

 The trial court also gave the general pattern jury instruction concerning witness credibility:
 

 You're the sole judges of the believability of witnesses. You must decide for yourselves whether to believe the testimony of any witness. You may believe all, any part, or none of a witness's testimony.
 

 In deciding whether to believe a witness, you should use the same tests of truthfulness that you use in your everyday lives. Among other things, these tests may include the opportunity of the witness to see, hear, know, or remember the facts or occurrences about which the witness has testified; the manner and appearance of the witness;
 
 any interest, bias, prejudice, or partiality a witness may have
 
 ; the apparent understanding and fairness of the witness; whether the testimony is reasonable; and whether the testimony is consistent with other believable evidence in this case.
 

 N.C.P.I.-Crim. 101.15 (2011) (emphasis supplied).
 

 Defendant contends his requested instruction regarding Brown was supported by the evidence because "Brown testified that, not only did he receive a benefit from providing this information to the State, he hoped for further reduction in his sentence after testifying."
 

 Brown pled guilty to one count of trafficking in heroin on 20 August 2014. As part of his plea arrangement, the State agreed that
 
 *686
 
 Brown provided substantial assistance such that a departure was appropriate from the sentencing schedule for trafficking offenses. Sentencing in Brown's matter was continued until 17 March 2015, at which time Brown received a sentence which departed from the requirements of
 
 N.C. Gen. Stat. § 90-95
 
 (h)(3). At the time of Defendant's trial in January 2016, Brown had fulfilled all of the conditions for entry of his plea and judgment in Brown's case had been entered in Wake County Superior Court. Brown's plea to trafficking in heroin was not contingent upon his truthful testimony against Defendant, and he had no arrangement with the State to testify against Defendant. Defendant concedes that Brown received a reduced sentence for information he provided against Defendant.
 

 Brown testified at trial that the prosecution had reduced his sentence for trafficking heroin by twenty months in exchange for the information he provided about Defendant. On direct examination, Brown further testified in the following exchange with the prosecution:
 

 Q.... So when you pled in, you got a benefit for talking to law enforcement, with Detective Brady back here?
 

 [Brown]. Yes, Ma'am.
 

 [Prosecutor]. And as a result of coming in here today, you don't automatically get any new benefit, is that right?
 

 [Brown]. No, Ma'am.
 

 [Prosecutor]. When we met with you this morning and with [your attorney], do you hope perhaps that you could get a benefit from this?
 

 [Brown]. Yes, Ma'am. I was under -- they told me that my lawyer could put a motion in.
 

 [Prosecutor]. At any point, have we agreed that you should get any additional time?
 

 [Brown]. No, Ma'am.
 

 [Prosecutor]. But your lawyer has said she might see if she can help you out?
 

 [Brown]. Yes, Ma'am.
 

 [Prosecutor]. So it's safe to say you hope that you can get a benefit?
 

 [Brown]. Yes, Ma'am.
 

 [Prosecutor]. But you are not guaranteed one as a result of coming in here today?
 

 [Brown]. No ma'am.
 

 Defendant asserts "[t]here is a reasonable likelihood that, had the jury been properly directed to consider Brown's hope for further benefit after testifying, it would not have convicted [Defendant] of first-degree murder." We disagree.
 

 The trial court's charge to the jury, taken as a whole, was sufficient to address the concerns motivating Defendant's requested instruction. The entire jury charge, including the instructions regarding interested witnesses, informants, and the jury's ability to take into consideration "any interest, bias, prejudice or partiality a witness may have" was sufficient to apprise the jury that they may consider whether Brown was interested, biased, or not credible.
 
 See
 

 State v. Singletary
 
 ,
 
 247 N.C. App. 368
 
 , 377,
 
 786 S.E.2d 712
 
 , 719 (2016) (holding trial court's denial of defendant's requested instruction was not error because "[t]he trial court's jury charge was sufficient to address Defendant's concerns, as it left no doubt that it was the jury's duty to determine whether the witness was interested or biased"). The entire jury instruction given by the trial court was supported by the evidence and in "substantial conformity" with the instruction requested by Defendant.
 
 State v. McNeill
 
 ,
 
 346 N.C. 233
 
 , 239,
 
 485 S.E.2d 284
 
 , 288 (1997),
 
 cert. denied
 
 ,
 
 522 U.S. 1053
 
 ,
 
 118 S.Ct. 704
 
 ,
 
 139 L.Ed.2d 647
 
 (1998).
 

 Additionally, we note the State made no promises to Brown in exchange for his truthful testimony in this case. Defendant's requested instruction, that Brown "testified with the hope that [his] testimony would convince the prosecutor to recommend a charge reduction," was not supported by the law or the evidence as there was no possibility Brown could receive any such "charge reduction."
 

 Brown had no pending charges at the time he testified against Defendant, and thus, there were no charges to reduce. When asked at oral argument before this Court how the State could make concessions to Brown, who was serving an active sentence with no pending charges, Defendant argued that a motion for appropriate relief could be filed on Brown's behalf. However,
 
 *687
 
 N.C. Gen. Stat. § 15A-1415(b) (2017), provides "the only grounds" for which Brown could have asserted a motion for appropriate relief. The exhaustive list set forth in that statute does not allow relief from entry of judgment for a defendant who subsequently provides truthful testimony.
 
 See
 
 id.
 

 Even presuming the trial court erred by denying Defendant's requested instruction, Defendant cannot demonstrate prejudice to award a new trial. Defendant had ample opportunity to cross-examine Brown regarding his agreement with the State, as well as to argue to the jury that Brown's deal with the State, as well as Brown's hope for another future sentence reduction, motivated Brown's testimony and impacted his credibility and truthfulness.
 

 In
 
 State v. Mewborn
 
 , this Court found no prejudice resulted from the trial court's refusal to give the pattern instruction on witnesses with immunity or quasi-immunity where the "defendant had the opportunity to cross-examine [the witness] about any alleged agreement and to argue to the jury regarding the impact of any alleged agreement upon [the witness'] credibility" and "the jury had before it evidence of [the witness'] arrest, the charges pending against [the witness], his cooperation with police, his plea agreement, and his pending sentencing hearing."
 
 State v. Mewborn
 
 ,
 
 178 N.C. App. 281
 
 , 293,
 
 631 S.E.2d 224
 
 , 232,
 
 disc. review denied
 
 ,
 
 360 N.C. 652
 
 ,
 
 637 S.E.2d 187
 
 (2006).
 

 Here, the jury was presented evidence of Brown's conviction and sentence for trafficking heroin, his testimony that he contacted the prosecution about the information he gained from Defendant because he "wanted to get substantial assistance for talking to them about the murder," and the details of the resulting agreement to reduce Brown's prison sentence.
 

 Defendant has failed to show that the trial court's refusal to give the requested instruction had a likely impact on the jury's verdict or misled the jury.
 
 See
 
 id.
 

 Defendant asserts the trial court's omission of the requested instruction was prejudicial because "[n]o physical evidence placed [Defendant] inside the apartment, much less implicate[s] him as an assailant."
 

 The evidence showed there were clothes dryer vents on each side of Huggins-Jones' apartment balcony. Investigators found partial shoe prints atop the dryer vent on the right side of Huggins-Jones' balcony. City County Bureau of Investigation Agent Tracy Davis was admitted as an expert witness in the field of footwear examination at trial. Agent Davis testified the partial shoe prints atop the dryer vent had characteristics consistent with the black and red Nike tennis shoes Defendant was wearing on the night of the murder.
 

 Redden observed Defendant standing on Huggins-Jones' apartment balcony, appearing to wipe off the railing. Redden testified she observed specks of blood on Defendant's shirt. A swabbing sample taken from Huggins-Jones' balcony railing tested positive for her blood. Redden recounted that Defendant and Anthony had a conversation the night of the murder that they were "happy that the little girl [Huggins-Jones' daughter] did not wake up."
 

 Contrary to Defendant's assertion, there was substantial evidence, apart from Brown's testimony, from which the jury could have found Defendant was present inside Huggins-Jones' apartment with Anthony and participated in her murder which caused her blood to be upon his shirt.
 

 We find no error in the trial court's ruling to omit Defendant's requested instruction. Presuming,
 
 arguendo
 
 , the trial court erred, Defendant cannot show the jury was misled by the omission of the requested instruction or that he was prejudiced. Defendant's argument is without merit and overruled.
 

 V.
 
 Testimony On Jailhouse Attack
 

 Defendant also argues the trial court abused its discretion by permitting, over his objection, Brown 's testimony about a jailhouse attack.
 

 Brown testified he was transferred to the Wake County Courthouse to testify for the State at a pretrial hearing in November 2015. Brown said that when he arrived at the courthouse, Defendant was present inside a holding cell. Brown stated Defendant threatened
 
 *688
 
 him and made a motion with his hands "like he was going to cut me. He was telling me I was dead."
 

 After Brown testified at the pretrial hearing, he was taken back to the jail next door to the courthouse. Brown was placed in a pod across from Defendant, but separated by a glass window. Brown stated Defendant was staring at him through the window and appeared to be "talking trash." A few moments later "somebody came to him and threatened him" for testifying against Defendant. Brown returned to his cell. Shortly thereafter, the same person who had threatened him moments earlier came into the cell and assaulted Brown. Brown testified the assailant asked him if he was telling on "Tray." Brown stated "Tray" was a nickname for Defendant.
 

 Defendant argues the evidence of the jailhouse attack, but not the threats made by Defendant, was both irrelevant and unduly prejudicial under Rules 401, 402, and 403 of the North Carolina Rules of Evidence. N.C. Gen. Stat. § 8C-1, Rules 401, 402, 403 (2017).
 

 Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401. Irrelevant evidence is evidence "having no tendency to prove a fact at issue in the case."
 
 State v. Hart
 
 ,
 
 105 N.C. App. 542
 
 , 548,
 
 414 S.E.2d 364
 
 , 368,
 
 disc. review denied
 
 ,
 
 332 N.C. 348
 
 ,
 
 421 S.E.2d 157
 
 (1992). Under Rule 402, relevant evidence is generally admissible at trial while irrelevant evidence is inadmissible. N.C. Gen. Stat. § 8C-1, Rule 402.
 

 "Although a trial court's rulings on relevancy are not discretionary and we do not review them for an abuse of discretion, we give them great deference on appeal."
 
 State v. Grant
 
 ,
 
 178 N.C. App. 565
 
 , 573,
 
 632 S.E.2d 258
 
 , 265 (2006) (citation omitted),
 
 disc. review denied
 
 ,
 
 361 N.C. 223
 
 ,
 
 642 S.E.2d 712
 
 (2007).
 

 In challenging the relevancy of Brown's testimony regarding the jailhouse attack under Rules 401 and 402, Defendant asserts "The State presented no evidence tending to show that [Defendant] knew about, suggested or encouraged the attack on Brown; [Defendant] was in a different cell block from Brown at the time of the assault. The testimony was therefore without proper foundation and irrelevant[.]" We disagree.
 

 Brown testified Defendant was staring at him through a glass window in the jail immediately before the assailant approached Brown and threatened him. The same assailant returned several minutes later, asked if he was telling on "Tray," and assaulted him. This testimony clearly suggests Defendant was, at minimum, aware of the attack upon Brown or may have encouraged it.
 

 "Generally, evidence tending to show a defendant has attempted to induce a witness to testify falsely in his or her favor is relevant and admissible against the defendant."
 
 State v
 
 .
 
 Mebane
 
 ,
 
 106 N.C. App. 516
 
 , 529,
 
 418 S.E.2d 245
 
 , 253 (1992) (citing
 
 State v. Minton
 
 ,
 
 234 N.C. 716
 
 , 725,
 
 68 S.E.2d 844
 
 , 850 (1952) ). This evidence may consist of attempts to influence a witness by threats or intimidation.
 
 State v. Smith
 
 ,
 
 19 N.C. App. 158
 
 , 159,
 
 198 S.E.2d 52
 
 , 53 (1973).
 

 Evidence of threats against a witness may be relevant because it "may be construed as an awareness of guilt on the part of the defendant."
 
 State v. Larrimore
 
 ,
 
 340 N.C. 119
 
 , 151,
 
 456 S.E.2d 789
 
 , 806 (1995) (citing
 
 State v. Hicks,
 

 333 N.C. 467
 
 ,
 
 428 S.E.2d 167
 
 (1993) and
 
 Minton,
 

 234 N.C. at 716
 
 ,
 
 68 S.E.2d at
 
 844 ).
 

 Brown testified he did not want to be at trial because he had concerns for his safety. Our Supreme Court has held a witness may testify about his fear of a defendant and the reasons for his fear, as this is relevant to the issue of the witness' credibility.
 
 State v. Lamb
 
 ,
 
 342 N.C. 151
 
 , 158,
 
 463 S.E.2d 189
 
 , 193 (1995) ("Where, as here, the witness has been the subject of past acts of violence and thereby has reason to fear another individual, those past acts are relevant to the issue of the witness' character for truthfulness or untruthfulness." (quoting
 
 Larrimore
 
 ,
 
 340 N.C. at 152
 
 ,
 
 456 S.E.2d at
 
 807 ) ).
 

 The challenged testimony was clearly relevant under Rules 401 and 402 because it was
 
 *689
 
 probative to both issues of Defendant's guilt and Brown's credibility.
 
 See
 

 id.
 

 ;
 

 Larrimore,
 

 340 N.C. at 152
 
 ,
 
 456 S.E.2d at
 
 807 ;
 
 Hicks,
 

 333 N.C. at 467
 
 ,
 
 428 S.E.2d at
 
 167 ;
 
 Minton,
 

 234 N.C. at 716
 
 ,
 
 68 S.E.2d at 844
 
 . Defendant has failed to show the testimony at issue is irrelevant under Rule 401. N.C. Gen. Stat. § 8C-1, Rule 401.
 

 Defendant additionally argues the trial court abused its discretion by admitting the challenged testimony under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury ...." N.C. Gen. Stat. § 8C-1, Rule 403.
 

 A trial court's ruling under Rule 403 is reviewed for an abuse of discretion.
 
 State v. Triplett
 
 ,
 
 368 N.C. 172
 
 , 178,
 
 775 S.E.2d 805
 
 , 809 (2015). This Court will find an abuse of discretion only where a trial court's ruling "is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."
 
 Id
 
 . (citations omitted).
 

 Defendant asserts: "Without Melvin Brown's irrelevant testimony that [Defendant] may have had something to do with some sort of assault on Brown, there is a reasonable likelihood the jury would have acquitted [Defendant] of first degree murder." "Certainly, the evidence was prejudicial to the defendant in the sense that any evidence probative of the State's case is always prejudicial to the defendant."
 
 State v. Stager
 
 ,
 
 329 N.C. 278
 
 , 310,
 
 406 S.E.2d 876
 
 , 895 (1991) (citation omitted).
 

 Defendant only challenges the portion of Brown's testimony regarding the threats and attack in the jail cell by the unknown assailant. Defendant does not challenge Brown's testimony that Defendant was "going to cut [Brown] ... [and that Brown] was dead." Defendant cannot show he was prejudiced by the challenged testimony, much less that he was unfairly prejudiced in light of the similar unchallenged evidence of his threats to intimidate Brown.
 

 The challenged testimony was relevant and its probative value significant to both the issues of Defendant's knowledge of his guilt and Brown's credibility, and was not substantially outweighed by any undue prejudice. Defendant has failed to demonstrate how the challenged testimony was unfairly prejudicial or how its prejudicial effect outweighs its probative value. Defendant has failed to show the trial court abused its discretion by admitting the challenged testimony.
 

 VI.
 
 Conclusion
 

 The trial court did not err in providing the jury instruction as given and omitting the instruction requested by Defendant. Defendant has failed to demonstrate how Brown's challenged testimony was irrelevant, unfairly prejudicial, or how its prejudicial effect outweighs its probative value under Rules 401, 402 or 403. N.C. Gen. Stat. § 8C-1, Rules 401, 402, 403.
 

 Defendant has not shown any abuse of discretion from the admission of Brown's testimony regarding the jailhouse attack. Defendant received a fair trial, free from prejudicial errors he preserved and argued. We find no error in the jury's verdict or in the judgment entered thereon.
 
 It is so ordered
 
 .
 

 NO ERROR.
 

 Judges BERGER and ARROWOOD concur.